*Carrie Hoskin, v.*
*Lowe's Home Centers, LLC*

*Carrie Hoskin*
*March 15, 2016*

*Charles Fisher Court Reporting*

*442 East Mendenhall*

*Bozeman, MT  59715*

*(406) 587-9016*

*maindesk@fishercourtreporting.com*



**Min-U-Script® with Word Index**

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MONTANA
 2                 MISSOULA DIVISION

 3
    _____
 4
    CARRIE HOSKIN,
 5
            Plaintiff,
 6
      -vs-                    CAUSE NO.
 7                       9:15-cv-00062-DLC
    LOWE'S HOME CENTERS,
 8  LLC,
 9          Defendant.
10
    _____
11      DEPOSITION UPON ORAL EXAMINATION OF
12                 CARRIE HOSKIN
13  _____
14      BE IT REMEMBERED, that the deposition upon
15  oral examination of CARRIE HOSKIN, appearing at
16  the instance of Defendant, was taken at the
17  offices of Fisher Court Reporting, 3111 Grant
18  Street, Missoula, Montana, on Tuesday, March 15,
19  2016, beginning at the hour of 8:30 a.m., pursuant
20  to the Montana Rules of Civil Procedure, before
21  Jennifer Ann Wells, Court Reporter and Notary
22  Public.
23
24
25
```

Page 2

```
 1                 APPEARANCES
 2
 3  ATTORNEY APPEARING ON BEHALF OF THE PLAINTIFF,
 4  CARRIE HOSKIN:
 5          Torrance L. Coburn, Esq.
 6          TIPP & BULEY, P.C.
 7          2200 Brooks
 8          Missoula, MT  59806-3778
 9          (406) 549-5186
10          torrance@tippandbuley.com
11          - Present in Missoula -
12
13  ATTORNEY APPEARING ON BEHALF OF THE DEFENDANT,
14  LOWE'S HOME CENTERS, LLC:
15          John G. Crist, Esq.
16          CRIST, KROGH & NORD, LLC
17          2708 First Avenue North
18          Billings, Montana  59101
19          406-255-0400
20          jcrist@cristlaw.com
21          - Present in Missoula -
22
23  ALSO PRESENT:  Laura Watson, Bryan Hoskin
24
25
```

Page 3

```
 1                 I N D E X
 2
 3  EXAMINATION OF CARRIE HOSKIN BY:        PAGE
 4      MR. CRIST......................  5
 5
 6
 7          E X H I B I T S
 8  DEPOSITION EXHIBITS:                   PAGE
 9  Exhibit 1     Plaintiff's Responses to
10                Defendant Lowe's Home
11                Centers, LLC's First Set
12                of Discovery Requests....... 15
13  Exhibit 2     Hoskin.004-Hoskin.015,
14                job search emails........... 16
15  Exhibit 3     10/9/15 Bronc's Grocery
16                pay stub.................... 35
17  Exhibit 4     2015 Form 1099-G -
18                Unemployment Compensation... 36
19  Exhibit 5     3/11/16 Bronc's Grocery
20                pay stub.................... 36
21  Exhibit 6     2015 W-2 G&S
22                Distributing/Broncs
23                Grocery..................... 36
24  Exhibit 7     2012 W-2 Lowe's -
25                Hoskin.001.................. 42
```

Page 4

```
 1  Exhibit 8     2013 W-2 Lowe's -
 2                Hoskin.002.................. 43
 3  Exhibit 9     2014 W-2 Lowe's -
 4                Hoskin.003.................. 43
 5  Exhibit 10    Signature Page - Notice
 6                of Lowe's Policies,
 7                Orientation Guide, Code
 8                of Ethics, Data Security
 9                Statement................... 48
10  Exhibit 11    Lowe's New Employee
11                Orientation/Employee
12                Resource Guide -
13                Hoskin.019-Hoskin.036....... 49
14  Exhibit 12    Lowe's Employee Purchase
15                Policy MS-09 - Lowe's
16                000232-Lowe's 000234........ 62
17  Exhibit 13    10/29/14 Lowe's Receipt -
18                Hoskin.016.................. 67
19  Exhibit 14    11/10/14 - Employee
20                Statement - Lowe's 000129... 75
21  Exhibit 15    12/12/14 Employee
22                Statement - Lowe's 000184... 80
23  Exhibit 16    Lowe's Employee
24                Performance Report -
25                Lowe's 000118.............. 87
```

Page 5

1 WHEREUPON, the following proceedings were had and
2 testimony taken, to-wit:
3              ********
4
5              CARRIE HOSKIN,
6 called as a witness herein, having been first duly
7 sworn, was examined and testified as follows:
8
9              EXAMINATION
10
11 BY MR. CRIST:
12    Q.  Ms. Hoskin, my name is John Crist and I'm
13 the attorney that Lowe's has hired to represent it
14 in the case that you filed against them.
15         Have you ever been in a deposition like
16 this before?
17    A.  No.
18    Q.  Okay.  I imagine you've had at least a
19 chance to chat a bit with your lawyer, but what
20 happens here is, I ask you questions, you answer
21 questions.  Our court reporter takes down
22 everything that we both say.  When the deposition
23 is all over, it's reduced to a booklet, a
24 transcript.  You have a chance to review that and,
25 you know, you can't rewrite the whole thing, but

Page 6

1 you can make little changes, if you need to, that
2 sort of thing.  So you'll have that chance
3 afterwards.  But in order to get a clear
4 transcript, it's just important you and I follow
5 some basic rules.  The most important is that we
6 not talk over the top of one another, is that
7 okay?
8    A.  Yes.
9    Q.  And it's just hard for our court reporter
10 to get it down, if we do that.  The other is that
11 I, I'll need you to answer audibly and then say,
12 yes or no instead of uh-huh or huh-uh.  You will
13 absolutely fall into that, we all do in normal
14 conversation.  And I'll prompt you, and it always
15 sounds a little rude and I'll say something like,
16 was that a yes or was that a no, but that's the
17 only way I know to do it, okay?
18    A.  Okay.
19    Q.  If you don't hear one of my questions, if
20 just were still thinking about the last question
21 and would like it repeated, will you ask me to do
22 that?
23    A.  Yes.
24    Q.  Okay.  Just want to get a little
25 background to start.  Well, one last thing.  The

Page 7

1 deposition here today is just as though you were
2 in trial.  And you're under oath and so if you
3 were to say something here today under oath and
4 then in the trial of this case, say something
5 different under oath, I have the ability to pull
6 out the transcript and show that to the jury, do
7 you understand that?
8    A.  Yes.
9    Q.  Where were you born and raised?
10    A.  San Francisco, California.
11    Q.  And when did you move to Montana?
12    A.  In August of 2005.
13    Q.  And are you married?
14    A.  Yes, I am.
15    Q.  And what's your husband's name?
16    A.  Brian Hoskin.
17    Q.  And do you have kids?
18    A.  I do.
19    Q.  And how old are they?  Names and ages.
20    A.  I have a son, Michael, who is 37.  Or 38.
21 And I have a son, Jason, who's 37.
22    Q.  Do they live around here?
23    A.  They do not.  They live in California.
24    Q.  And they're all self sufficient and on
25 their own?

Page 8

1    A.  Yes, they are.
2    Q.  Okay.  Good.  Tell me, where did you go
3 to high school.
4    A.  Placer High School.
5    Q.  And what year did you graduate?
6    A.  I took my GED.  And I don't remember, it
7 was in '81 or '82.
8    Q.  Have you since then gone on for any other
9 formal education?
10    A.  No.
11    Q.  Have you been in any training programs or
12 anything of that sort?
13    A.  No.
14    Q.  Okay.  How did you get to Montana?
15    A.  My parents moved up here over 20 years
16 ago when my father retired and my father became
17 ill so we moved up here.  And he passed away two
18 years after we moved up here.
19    Q.  Sorry about that.  And where do you live?
20    A.  I live out in Frenchtown.
21    Q.  And have you lived there the whole time
22 you've been in Montana?
23    A.  Yes.
24    Q.  When did you start working for Lowe's?
25    A.  In October of 2006.

Page 9

1    Q.   Was that the first job you got when you
2   came to Montana?
3    A.   No.
4    Q.   What did you do before that?
5    A.   I worked at Dillard's for a short period
6   of time.
7    Q.   And what did you do at Dillard's?
8    A.   I was a floor associate.
9    Q.   And that's like a retail, you check
10  people out sort of stuff?
11   A.   Yes.
12   Q.   I want to get a little understanding of
13  the work you did before you came to Montana.  Out
14  of -- let's just take 1981, '82 around the time
15  you got your GED, what was your first job?
16   A.   We owned our own business.
17   Q.   And what was that business?
18   A.   We installed well pumps and water
19  systems.
20   Q.   Where was that business located?
21   A.   In Auburn, California.
22   Q.   And I don't know California.  Where is
23  that?
24   A.   About 50 miles north of Sacramento.
25   Q.   And was that for residential?

Page 10

1    A.   Residential, farm, yeah.
2    Q.   Okay.  And did you do that the entire
3   time?
4    A.   No.
5    Q.   Okay.  Tell me --
6    A.   We ran a business for 11 years and then
7   we sold the business and I went to work for an
8   office supply store.  And from there I went to
9   work for Bank of America and then I worked for
10  Ross's Dress for Less, and then I went to work at
11  JCPenneys, and then we moved up here.
12   Q.   I want to go through that in just a
13  little more detail.  So if you had the well, the
14  pump business for about 11 years, that puts us
15  into the early '90s or so when you sold that?
16   A.   Uh-huh.
17   Q.   Okay.  And then what office supply store
18  did you work at?
19   A.   Walker's Office Supply store.
20   Q.   Local?
21   A.   Yes.
22   Q.   What did you do there?
23   A.   I was -- wasn't really a job title.  So I
24  just, I helped customers, cashiered.  It was a
25  small store.  It wasn't much bigger than this

Page 11

1   building.
2    Q.   Okay.  So then a small retail store?
3    A.   Family owned and operated.
4    Q.   Not like an Office Max or an Office
5   Depot, nothing like that?
6    A.   No.
7    Q.   Okay.  How long did you stay there?
8    A.   I was there for six years.
9    Q.   And then you went to work for Bank of
10  America?
11   A.   Yep.
12   Q.   And what did you do for them?
13   A.   I was a teller.
14   Q.   And for how long?
15   A.   A little over a year.
16   Q.   And that put us, late '90s plus or minus?
17   A.   Right.  Well, I worked at Ross's at the
18  same time I worked at the bank.
19   Q.   Both part-time jobs?
20   A.   Yes.
21   Q.   And why did you leave the teller job?
22   A.   Because it was boring.  You just sat.
23  I'm an active person so I like to be on the move,
24  but it was good experience.  It gives you, you
25  know, good experience to, if you choose to go into

Page 12

1   the banking business again, that you have that,
2   you know, background history.
3    Q.   Did you leave on good terms?
4    A.   Oh, yeah.
5    Q.   At Ross's tell me what you did.
6    A.   I was a customer service and cash office
7   and floor associate.
8    Q.   And how long did you work for Ross?
9    A.   I left Ross about the same time I left
10  Bank of America because it was part-time.  I
11  wanted full-time.
12   Q.   Is that when you got the job at Penneys?
13   A.   Yes.
14   Q.   And what did you do there?
15   A.   Shipping and receiving.
16   Q.   And how long before you moved up to
17  Montana?
18   A.   Six years.
19   Q.   During this time were you always fully
20  employed?
21   A.   Yes.
22   Q.   Never had any breaks where you were
23  looking for work?  Substantial breaks, I mean.
24   A.   Well, no.  A month, if that's, not really
25  substantial.  That's just, you know.

---

Page 13

1    Q.  So you came to work at Dillard's, that's
2  over here the mall, right?
3    A.  Right.
4    Q.  And you were with them looks like less
5  than a year?
6    A.  Less than a year.
7    Q.  And then what why did you leave
8  Dillard's?
9    A.  They have a -- they hire you at a wage
10  like 9.90 an hour.  And then after you're broken
11  in for a month or your training period, they have
12  sales goals you have to meet.  And if you don't
13  meet them, they reduce your hourly wage.
14    Q.  Okay.
15    A.  So it's very cutthroat in that store.
16    Q.  Okay.
17    A.  So I moved on.
18    Q.  Did they ask you to leave?
19    A.  No.
20    Q.  You left, is that right?
21    A.  Yes.
22    Q.  Okay.  I want to -- I want to kind of do
23  this a little bit in reverse.  I want to talk
24  about what you've done since you left Lowe's
25  first, okay?

---

Page 14

1    A.  Okay.
2    Q.  Now, I understand, do you remember that I
3  sent some written questions that you answered?
4    A.  Uh-huh.
5    Q.  Based on that, I understand that you
6  received unemployment for about 28 weeks.
7    A.  Yes.
8    Q.  And did that -- did you find a job and
9  that ended or did it just run out?
10    A.  I found a job just before it ended.
11    Q.  And was that on purpose, did you know it
12  was coming up, that it was going to end?
13    A.  No, I had to do a weekly job search, as
14  required by unemployment.
15    Q.  And where did you typically do that
16  search?
17    A.  I went online to various different
18  companies and put in applications.
19    Q.  Sorry, go ahead.
20    A.  Everything is done online.  So all your
21  applications are done online.  So it's not like,
22  old school to where you fill out a paper one and
23  turn it in, you do everything online now.
24    Q.  And did you do -- during this period, I
25  understand -- who's your current employer?

---

Page 15

1    A.  My current employer is at Bronc's
2  Grocery.
3    Q.  Brach's?
4    A.  Bronc's.
5    Q.  Bronc's.  And when did you start there?
6    A.  July of 2015.
7    Q.  You were let go at Lowe's in --
8    A.  December of 2014.
9    Q.  Right.  So December, I think, 16th.  So
10  you didn't work for about a, what, six, seven
11  month period there?
12    A.  Yes.
13    Q.  And during that six or seven month period
14  you weren't working, were all of your applications
15  made online?
16    A.  Yes.
17    Q.  Was there ever an occasion between the
18  time you were let go at Lowe's and the time you
19  started at Bronc's that you made an in person
20  application anywhere?
21    A.  No.  I had several interviews.
22    Q.  Well, and I want to talk a bit about
23  those.  So you -- we'll mark this.
24      (Whereupon, Exhibit No. 1 was marked for
25  purposes of identification.)

---

Page 16

1      (Whereupon, Exhibit No. 2 was marked for
2  purposes of identification.)
3  BY MR. CRIST:
4    Q.  Ms. Hoskin, I've placed before you your
5  responses to some discovery requests that I made
6  as Exhibit 1.  And then Exhibit 2 are copies of
7  all of the documents that you produced in response
8  to those requests that showed efforts by you to
9  find a job, okay.  And if you would turn to page 3
10  of Exhibit No. 1, what I did is I kind of compared
11  Exhibit 2 to Exhibit 1 and marked those where I
12  saw there was some evidence of you having applied,
13  okay?
14      And so what I'd like to do is kind of go
15  through those and just talk with you a little bit
16  about these various job applications.  You haven't
17  dated any of those, you know, other than where
18  I've got a document showing the date of your
19  application.  Do you have any other way to
20  reference when you applied for these jobs?
21    A.  No.  Other than the responses, their
22  email responses were usually the same day.
23    Q.  Okay.  And it appeared to me that the,
24  the documents that you did have, you gave to me in
25  chronological order.  Do you think your

---

Page 17

1 applications here are listed in the order in which
2 you made the applications?
3    A. Honestly, I don't know. I wrote them
4 down as I, the information I gave my attorney was
5 as I had wrote them down.
6    Q. Okay.
7    A. So, yes, it's possible. I won't say yes
8 or no on that.
9    Q. Okay. So you're getting -- what
10 you -- let me back up.
11       As you applied for a job did you keep a
12 log of that job?
13    A. Yes.
14    Q. Okay. Do you still have that?
15    A. Maybe. I'm not sure.
16    Q. And was it just a handwritten log that
17 you kept?
18    A. Yes.
19    Q. And what information did you record on
20 that?
21    A. The date I applied, where I applied, the
22 address and the phone number, and the method that
23 I applied, which was online.
24    Q. Did you record on that if you had any
25 followup or interviews or anything like that?

Page 18

1    A. No.
2    Q. You didn't have any other notes that
3 would indicate that?
4    A. I might have emails from, like, Home
5 Depot and such setting up confirmations of
6 interviews.
7    Q. Did you save those?
8    A. I think so.
9    Q. So if we wanted to have you produce those
10 you think you could locate them today?
11    A. I would try, yes.
12    Q. Let me just go through the list and talk
13 with you a little bit about these then. You don't
14 have that log with you today, do you?
15    A. No.
16    Q. Park Side Credit Union, that's in
17 Missoula, correct?
18    A. Yes.
19    Q. And it appears to me you applied online
20 there?
21    A. Yes.
22    Q. And did anything come of that?
23    A. I don't know if you have the response in
24 there or not.
25    Q. You can look along with me, if you'd

Page 19

1 like. And, yeah, I see there is a response here.
2    A. Park Side Credit Union. Was -- that was
3 the response they sent me.
4    Q. Okay. And was there any further followup
5 from that?
6    A. No.
7    Q. And did you ever call or contact them
8 again to talk about a job?
9    A. No.
10    Q. And did they ever reach out to you?
11    A. No.
12    Q. The next place was Home Depot and there
13 was a response as well here.
14    Q. And you applied online?
15    A. Yes.
16    Q. And they responded back to you, correct?
17    A. Yes.
18    Q. And did you ever have an interview there?
19    A. Yes, three.
20    Q. Three interviews. Okay. Now, I saw that
21 there they're actually listed here a couple of
22 times.
23    A. Yes.
24    Q. Four times actually?

Page 20

1    A. Yes.
2    Q. So how is it that you applied there four
3 times or had four interviews, tell me about that.
4    A. They listed positions that I qualified
5 for and I applied for them. They keep your file,
6 your application for 90 days and then you can
7 reapply. And I reapplied for two of the positions
8 twice and finally got a phone call and an
9 interview was set up for two different positions.
10    Q. And what positions were those?
11    A. One was receiving or freight. And the
12 other one was merchandising.
13    Q. Were those jobs that you felt you had the
14 qualifications for?
15    A. Yes.
16    Q. And you were interviewed for those jobs?
17    A. Yes.
18    Q. And do you remember who interviewed you?
19    A. I do not right offhand. One was the
20 manager of the merchandising department for the
21 merchandising position. And I was interviewed by
22 the store manager after that interview because
23 they thought that there might be a position
24 elsewhere in the store for me. And the first one,
25 he was a department manager. I don't know of

Page 21

1   what. It might have been receiving. But
2   apparently the position had already been filled.
3      Q.  Did they tell you -- did they call you
4   later and say they weren't going to offer you the
5   job?
6      A.  No.
7      Q.  Did they ever communicate to you why you
8   didn't get the job?
9      A.  Well, in the interview with the
10  merchandising department manager, I got the -- as
11  we talked, I got the impression that they were
12  going to hire within.
13     Q.  Okay.  But that's just your impression?
14     A.  Yeah.
15     Q.  Has anyone or any of the people you
16  applied to work for ever told you that they
17  weren't giving you the job because you had been
18  let go at Lowe's?
19     A.  No.
20     Q.  And at Home Depot did they indicate that
21  that was a concern of theirs?
22     A.  No.
23     Q.  Did you discuss with them at all the
24  circumstances surrounding your departure from
25  Lowe's?

Page 22

1      A.  They asked.
2      Q.  And what did you tell them?
3      A.  I told them the truth.
4      Q.  What did you tell them?
5      A.  I told them I was terminated for
6   something I didn't do.
7      Q.  And did they inquire any further on that?
8      A.  No.
9      Q.  The next one on your list is Costco.  And
10  again there is a email response from Costco here,
11  I think acknowledging your application, correct?
12     A.  That's correct.
13     Q.  And that's the third page.  It's marked
14  006 on the bottom there, right?
15     A.  Yes.
16     Q.  Other than this email back from Costco,
17  did you ever hear from them again?
18     A.  No.
19     Q.  And I think you did apply to them later.
20     A.  Yes.
21     Q.  And was it also an online application?
22     A.  Yes.
23     Q.  And did you get back a similar email?
24     A.  I probably did.
25     Q.  And what job were you looking for there?

Page 23

1      A.  They -- just cashier.
2      Q.  And were you ever interviewed there?
3      A.  No.
4      Q.  So other than you emailing them an
5   application and them emailing back, that was the
6   extent of anything you had with Costco?
7      A.  Yes.
8      Q.  Looks like you applied at CVS.
9      A.  Yes.
10     Q.  And again there's an email response from
11  them.  What was the position -- well, looks like
12  photo tech.
13     A.  Photo tech.
14     Q.  And they sent you back an email
15  acknowledging your application?
16     A.  Yes.
17     Q.  And did you ever have an interview with
18  them?
19     A.  No.
20     Q.  Did you ever hear anything more from
21  them?
22     A.  No.
23     Q.  Sears, you also -- if you look at
24  Exhibit 2, there was a response from Sears.
25     A.  Yes.

Page 24

1      Q.  The team lead position, what's that job?
2      A.  It was just to be in, you know, in charge
3   of a department and people working under you.  It
4   wasn't really difficult or complicated.  You were
5   just in a department, like, say shoes or, you
6   know, women's apparel.  And you just make sure
7   everybody put out merchandise.
8      Q.  And you applied online?
9      A.  Yes.
10     Q.  And they responded to you?
11     A.  With the email.
12     Q.  And did you ever hear anything else?
13     A.  No.
14     Q.  And did you do anything to followup at
15  Sears?
16     A.  No.
17     Q.  Ross was next?
18     A.  Yes.
19     Q.  On your list.  You had worked for Ross in
20  California.
21     A.  I did.
22     Q.  And the position was specialist, what's
23  that job?
24     A.  Same as, everybody lists their positions
25  with different head headings.  And pretty much

Page 25

1   they're all the same thing.  You're in charge of a
2   department, and you make sure everything is
3   stocked properly, you assist the customers and.
4     **Q.  Just the people we all see walking around**
5   **the store?**
6     A.  Right.
7     **Q.  Saying, "Can I help you"?**
8     A.  Right.  Exactly.
9     **Q.  And I don't have an indication, anything**
10  **from them.  Did you apply online?**
11    A.  Yes, I did.
12    **Q.  And do you remember if you ever heard**
13  **back?**
14    A.  I do not recall at this time.  I would
15  have to go through my emails and see.  I thought
16  that I had printed out all of them.  I may have
17  missed one.
18    **Q.  It happens.  Did you do anything to**
19  **follow up with Ross?**
20    A.  No.
21    **Q.  Ever have an in-person interview?**
22    A.  No.  When you go into these places to
23  apply or, you know, show interest, they tell you
24  to apply online.  I applied at Kohl's, recently
25  went in for an interview and they give you a

Page 26

1   little postcard letting you know that you will be
2   notified by email whether or not the position is
3   for you.
4     **Q.  Okay.**
5     A.  And when you go in to follow up they tell
6   you that everything is done online.
7     **Q.  I'm not blaming you for applying online.**
8   **It's been a long long time since I applied for a**
9   **job so.**
10    A.  It's not like it used to be.
11    **Q.  Yeah.  Let me just continue with the list**
12  **here.  You apparently applied for a job at Harbor**
13  **Freight?**
14    A.  Yes, I did.
15    **Q.  And that was also an online application?**
16    A.  Yes, it was.
17    **Q.  And do you remember if you heard back**
18  **from them?**
19    A.  I don't believe I did.
20    **Q.  And I assume you had no interview.**
21    A.  No.
22    **Q.  The next was at Shopko?**
23    A.  Yes.
24    **Q.  And also an online application?**
25    A.  Yes.

Page 27

1     **Q.  And did you hear back from them?**
2     A.  I did not.
3     **Q.  And did you have an interview?**
4     A.  No.
5     **Q.  Home Depot.  We've talked about a little**
6   **bit.  REI, I believe there was an indication on**
7   **Exhibit 2 of a response from REI?**
8     A.  Yes.
9     **Q.  And the job there was a stocking**
10  **specialist?**
11    A.  Yes.
12    **Q.  And you did at least get an email**
13  **response from them, correct?**
14    A.  I did.
15    **Q.  And anything further?**
16    A.  No.
17    **Q.  Target, you applied online?**
18    A.  I did.
19    **Q.  And, again, it appears you got an email**
20  **response from Target?**
21    A.  Yes.
22    **Q.  And was there any further communication**
23  **with them?**
24    A.  No, there was not.
25    **Q.  And Sportsman's Warehouse is the next on**

Page 28

1   your list.  Again, you applied online?
2     A.  Yes.
3     **Q.  And it does look like you got a response**
4   **from them by email?**
5     A.  Yes.
6     **Q.  And, but nothing, nothing further?**
7     A.  No.
8     **Q.  And Staples, again, you applied online?**
9     A.  Yes.
10    **Q.  And got a response from them, it appears**
11  **Exhibit 2, correct?**
12    A.  Yes.
13    **Q.  And was there any further communication**
14  **with them?**
15    A.  No.
16    **Q.  Maybe we can shorten this up a little**
17  **bit.  As I look through the rest of your list**
18  **there is a few new places, it looks like you**
19  **reapplied at, like Harbor Freight, for example,**
20  **Costco, Target.  Were all of those additional**
21  **applications made online?**
22    A.  Yes.
23    **Q.  And did you get interviews for any of**
24  **those jobs?**
25    A.  No.

Page 29

1    Q.   So the only person that interviewed you
2    for a job between the time you were terminated at
3    Lowe's and the time you started working for
4    Bronc's Grocery was Home Depot?
5    A.   Yes.
6    Q.   During that, I guess let's see, I guess
7    it would be a seven-month period of time
8    approximately, six and a half, seven months, did
9    you have any source of income other than
10   unemployment compensation?
11   A.   No.
12   Q.   Is your husband employed?
13   A.   Yes, he is.
14   Q.   And where does he work?
15   A.   Knife River.
16   Q.   What does he do for Knife River?
17   A.   He's a truck driver.
18   Q.   And was his salary during this six or
19   seven-month period that you weren't working
20   sufficient to cover your family bills?
21   A.   No.
22   Q.   So what did you live on?
23   A.   We have a few credit cards that we used.
24   Q.   So employment and then basically
25   borrowing on credit cards is how you made up the

Page 30

1    difference?
2    A.   Yes.
3    Q.   Did you go into the job, do they have a
4    job service here locally?
5    A.   They do.
6    Q.   Have you ever gone into it?
7    A.   Yes, I have.
8    Q.   Okay.  And tell me when you first did
9    that.
10   A.   I went in there when I first moved up
11   here, got registered and signed up.
12   Q.   Is that how you found a job up here
13   initially?
14   A.   Yes.
15   Q.   And was that how you found the Lowe's
16   job?
17   A.   No.  I had a brother who worked at Lowe's
18   and he told me they were hiring cashiers.  He said
19   I should come in and apply and I did.
20   Q.   After you were let go from Lowe's, did
21   you go to the job service?
22   A.   No.  I went online to their website.  I
23   had to reregister per unemployment, that's one of
24   their requirements.  So I had to reactivate the
25   account that I already had there.

Page 31

1    Q.   And did you -- where did you locate
2    information about these jobs that we've been
3    talking about?  How did you find out about them?
4    A.   A lot of them were on their website
5    postings.  Others I just would go to like Home
6    Depot dot-com or, you know, Harbor Freight.
7    Q.   And when you say, "They were on their
8    website," do you mean the job services?
9    A.   Job service's website.
10   Q.   And did you go on that each week?
11   A.   I did.
12   Q.   And it looks to me at least from these
13   that you were applying for about a job a week.
14   A.   Yes.
15   Q.   And what is the requirement in order to
16   keep your unemployment compensation?  How many
17   jobs do you have to apply for?
18   A.   One job a week.  You have to do a weekly
19   job search.
20   Q.   And do you have to provide the state with
21   proof that you did that?
22   A.   Yeah, I have to input where I applied,
23   the address, a contact number, and how I applied
24   and what the response was.
25   Q.   So when is the first time you started

Page 32

1    working again after having been let go at Lowe's?
2    A.   July of 2015.
3    Q.   And do you remember when in July?
4    A.   It might have been the 8th or 9th.
5    Q.   And tell me what Bronc's Grocery is.
6    A.   It's a small town grocery store.  I
7    was -- I applied for the deli position.
8    Q.   And is that where you're still working?
9    A.   I am still working there.  I work the
10   deli sometimes now, but mostly on the floor as a
11   cashier and doing freight.
12   Q.   What were you initially hired for?
13   A.   Deli.
14   Q.   Deli.  And how many hours a week?
15   A.   It was about 25 hours a week.
16   Q.   And has it continued to be about 25 hours
17   a week since July of 2015?
18   A.   In the holiday season, November and
19   December I was working about 40 hours a week.  And
20   now it's dropped back down to about between 20 and
21   25.
22   Q.   Have you reapplied for unemployment at
23   all since you started working there?
24   A.   Yes.
25   Q.   And tell me when you first did that?

---

Page 33

1    A.  I did that in December of 2015.
2    Q.  And is that as a result of your hours
3  going down?
4    A.  Yes.
5    Q.  And as we sit here today, are you getting
6  unemployment compensation?
7    A.  I am.
8    Q.  And have you been getting unemployment
9  since December of 2015?
10    A.  There was two weeks that I didn't get it
11  for because I worked 40 hours, but other than
12  those two weeks, yes.
13    Q.  And I'll go back and talk a little about
14  your wages and such.  But have you applied for
15  other jobs since you got your job at Bronc's
16  Grocery?
17    A.  Yes.
18    Q.  And tell me what you applied for?
19    A.  I applied at Kohl's.  I've applied at
20  Shopko because I'm required to do a weekly job
21  search.  I've applied at Home Depot again.  And I
22  think there's one or two others.  I can't remember
23  what they are.  I have them written down.
24    Q.  And all of these jobs that you've applied
25  for since you started working at Bronc's Grocery,

---

Page 34

1  have you applied for them during the time period
2  after you sought unemployment compensation?
3    A.  Yes.
4    Q.  So have you applied for them as part of
5  your requirement that you seek work weekly?
6    A.  Yes.
7    Q.  When -- had you applied for any jobs, I
8  want to talk about the period after you starting
9  working for Bronc's Grocery.  Had you applied for
10  any other jobs other than in connection with the
11  requirements to get unemployment compensation?
12    A.  No.
13    Q.  Did -- you like your job at Bronc's
14  Grocery?
15    A.  Yes.
16    Q.  And what's the prospects for going back
17  to more hours for you?
18    A.  It's not.  It's a part-time job.  That's
19  what I was hired for.  They hire only part-time.
20    Q.  And when you started there, did you want
21  to work full-time?
22    A.  Yes.
23    Q.  Why didn't you apply for any other jobs
24  from July until December, if you wanted to work
25  full-time?

---

Page 35

1    A.  Because it was convenient at the time and
2  there were no full-time jobs that I qualified for
3  during those months.  So when you have someone who
4  will give you a job and it's two miles from your
5  house, your gas expense is low, and you have more
6  money.  For me to drive from Frenchtown to
7  Missoula working a part-time job is not
8  financially responsible.  So I was doing what I
9  thought was the responsible thing at the time.
10    Q.  Over in Billings I think the unemployment
11  is like two percent or something.  Do you have any
12  sense of what it is over here in Missoula?
13    A.  Nope.
14    Q.  When you started working at Bronc's
15  Grocery, I believe -- maybe I got it from your pay
16  stub.  Let's mark this Exhibit 3, please.
17        (Whereupon, Exhibit No. 3 was marked for
18  purposes of identification.)
19  BY MR. CRIST:
20    Q.  Ms. Hoskin, I've placed before you what
21  we've marked as Exhibit 3.  And this is a pay stub
22  that you provided me in response to the discovery
23  requests for, it looks like the period 9/21/15 to
24  10/4/15, is that correct?
25    A.  Yes.

---

Page 36

1    Q.  And you indicate you were making $8.05 an
2  hour?
3    A.  That's correct.
4    Q.  And is that the starting wage when you
5  went to work for Bronc's Grocery?
6    A.  It is.
7    Q.  And has that changed?
8    A.  It has not.
9    Q.  So is that what you're currently making
10  per hour?
11    A.  That's what I'm currently making.
12    Q.  Are there any benefits at all?
13    A.  No.
14        MR. CRIST:  Let's mark that.
15        (Whereupon, Exhibit No. 4 was marked for
16  purposes of identification.)
17        (Whereupon, Exhibit No. 5 was marked for
18  purposes of identification.)
19        (Whereupon, Exhibit No. 6 was marked for
20  purposes of identification.)
21  BY MR. CRIST:
22    Q.  Ms. Hoskin, I've put in front of you
23  Exhibits 4, 5, and 6.  Let's just take them one at
24  a time here.  Exhibit No. 4 appears to me to be
25  the 1099 you got from the state of Montana showing

---

Page 37

1  the amount of unemployment compensation you got in
2  2015, is that correct?
3      A.  That's correct.
4      Q.  Let's look at Exhibit 5.  That's a
5  current, that's probably your most recent pay
6  stub, is that for your job?
7      A.  That's correct.
8      Q.  And that shows 53 hours, is that in a
9  two-week period?
10     A.  It is.
11     Q.  And it's still the same 8.05 an hour,
12  correct?
13     A.  That's correct.
14     Q.  And then Exhibit 6, is that the W-2, it
15  says G&S Distributing, is that Bronc's Grocery?
16     A.  Yes, it is.
17     Q.  And is Exhibit 6 the W-2 you received for
18  the wages you received there in 2015?
19     A.  It is.
20     Q.  I should have said, by the way, if you
21  need a break at any point, please let me know.
22  I'll probably take a break about every hour, but.
23         What are your plans for finding other
24  work?  Do you just plan to just continue at
25  Bronc's Grocery?

Page 38

1      A.  Well, no, I'm doing a weekly job search.
2  I cannot, I need to have a full-time job.  There
3  are not many out there so it's a little difficult.
4      Q.  Is it your intention to keep looking for
5  full-time work until you find it?
6      A.  Yes, it is.
7      Q.  How old are you, by the way?
8      A.  I am 56.  Excuse me, I am 55 and a third.
9      Q.  Okay.  Let me talk with you a little bit
10  about your work at Lowe's.  When you -- you
11  started at Lowe's in 2006.
12     A.  That's correct.
13     Q.  And what was your first job there?
14     A.  I was a cashier.
15     Q.  And you started to tell me a bit about
16  this, but tell me how you got the job.
17     A.  My brother worked there and he said that
18  they were hiring, that I should come in and apply.
19  So I did.
20     Q.  And what's your brother's name?
21     A.  Eric Lee.
22     Q.  Is he still working at Lowe's?
23     A.  He is not.
24     Q.  When did he stop working there?
25     A.  I want to say 2007.  I'm not sure.

Page 39

1      Q.  So how long did you work as a cashier?
2      A.  90 days.
3      Q.  And then what happened?
4      A.  I moved out to the freight crew.
5      Q.  And what did you do when you were part of
6  the freight crew?
7      A.  We distributed freight throughout the
8  store, put it away.
9      Q.  Did you learn to drive any vehicles?
10     A.  I did.
11     Q.  Tell me what you learned to do?
12     A.  The picker and forklift.
13     Q.  Anything else?
14     A.  No.
15     Q.  Is that -- are those skills that you had
16  before this?
17     A.  No.
18     Q.  And how long did you work on the freight
19  crew?
20     A.  I don't know, six, eight months.
21     Q.  And what happened then?
22     A.  I went to windows and walls.
23     Q.  What was your job there?
24     A.  Customer service.  I helped customers
25  order window blinds.

Page 40

1      Q.  How long did you do that?
2      A.  For quite a few years.
3      Q.  And then what happened?
4      A.  I applied for the pricing coordinator's
5  position.
6      Q.  And how long did you have that job before
7  you were terminated?
8      A.  Four and a half, five years.
9      Q.  What did you do as pricing coordinator?
10     A.  I pulled a daily report and activated the
11  price changes that were dropped by corporate.
12     Q.  I don't -- I kind of know what that
13  means, but I don't really.  Can you tell me in a
14  little more detail what you mean?
15     A.  Every morning they'd print -- they'd
16  generate a report and on the report there was
17  anywhere from 300 to 1500 items that needed their
18  prices activated because they had changed them
19  corporately.  Labels were automatically download
20  to the system, you printed them out, you went
21  through the report and zeroed out anything that
22  was nonstock or zero on hand that we had no
23  product of.  And then you proceeded to go from
24  department to department activating the prices and
25  changing the labels.

Page 41

1   Q.  And did you have to physically do that on
2   each of these items or did you distribute
3   information to others who did that?
4   A.  No, I had to physically do that.  And if
5   there was anything that I could not find, then I
6   would give it to the department manager or
7   whomever was in the department that day, saying,
8   you know, I can't find this item, you need to
9   locate it and, you know.
10   Q.  Just to make it really simple for me,
11   let's say that a Phillips screwdriver, the price
12   had dropped $0.05 or something like this.  You saw
13   that on your computer printout.  Tell me how it
14   went from there to you changing the price?
15   A.  I would have a label.  I would have a
16   scan gun.  I would activate the price.  I'd go
17   over and pull the old label of and put the new
18   label on.
19   Q.  Did you have anything to do with
20   identifying clearance items?
21   A.  Yes.
22   Q.  Tell me what you did in that respect.
23   A.  They were also on the price change
24   report.  And it would say that it's a clearance
25   item.  They would print in a yellow and white

Page 42

1   label indicating that they are either reduced to a
2   new lower price or clearance and I would locate
3   those items as I would any other item that needed
4   the price changed.
5   Q.  This is just from walking in a Lowe's
6   store myself, but seems to me the clearance stuff
7   is usually up front.
8   A.  Not always.
9   Q.  Not always.
10   A.  There's sections in each department that
11   have, you know, designated area that would be for
12   clearance items.  Some were in amongst regular
13   merchandised items.
14   Q.  So for example, in the fall when the gas
15   grills go on clearance, are you responsible for
16   getting them organized in the store?
17   A.  No.
18   Q.  Or just pricing changes?
19   A.  Just pricing changes.
20   Q.  And is that the job you were working in
21   at the time you were terminated?
22   A.  Yes.
23   MR. CRIST:  Mark that, please.
24   (Whereupon, Exhibit No. 7 was marked for
25   purposes of identification.)

Page 43

1   MR. CRIST:  Make that eight, please.
2   (Whereupon, Exhibit No. 8 was marked for
3   purposes of identification.)
4   (Whereupon, Exhibit No. 9 was marked for
5   purposes of identification.)
6   BY MR. CRIST:
7   Q.  Ms. Hoskin, I've put before you what
8   we've marked as Exhibits 7, 8, and 9.  And do
9   you -- well, let's just take them one at a time.
10   Do you recognize exhibit 7 as your Lowe's W-2 for
11   2012?
12   A.  Yes.
13   Q.  And that would, I'm looking under the
14   social security wages near the top indicates you
15   earned $19,465.42, do you see that?
16   A.  Yes.
17   Q.  How many hours a week were you typically
18   working in 2012, if you recall?
19   A.  39.  Just short of 40, 38, 39.
20   Q.  And was it the same in 2013, 2014?
21   A.  Yes.  Give or take an hour here and
22   there.
23   Q.  How many hours a week did a person have
24   to work to be considered full-time at Lowe's?
25   A.  I believe it's 37 or 38.

Page 44

1   Q.  And were you always full-time in these
2   three years?
3   A.  Yes.
4   Q.  And let's look at Exhibit 8.  That's your
5   2013 W-2 for the work you did at Lowe's, correct?
6   A.  Yes.
7   Q.  And you made $19,846.27?
8   A.  Yes.
9   Q.  And were you also working full-time that
10   year?
11   A.  Yes.
12   Q.  And then Exhibit 9 is your 2014 W-2 for
13   the work you did at Lowe's, correct?
14   A.  Yes.
15   Q.  And that year you made a little more,
16   $21,337.98, correct?
17   A.  Yes.
18   Q.  You also got some -- did you work five
19   days a week at Lowe's?
20   A.  Yes.
21   Q.  And typically what, seven, eight hours a
22   day, something like that.
23   A.  Yeah, yeah.
24   Q.  What shifts did you typically work?
25   A.  A pricing coordinator shift was from five

Page 45

1 until two.
2 **Q. So five in the morning until two in the**
3 **afternoon?**
4 A. That's correct.
5 **Q. And did you pretty much work that**
6 **schedule all of those three years?**
7 A. Yes. Well, I worked that schedule when I
8 became pricing coordinator?
9 **Q. Yeah.**
10 A. Prior to that, it was up and down
11 schedule.
12 **Q. Sure. Okay. What time did the store**
13 **open?**
14 A. Six o'clock.
15 **Q. You got some benefits when you were**
16 **working at Lowe's?**
17 A. I did.
18 **Q. And one of the benefits was health**
19 **insurance, was it not?**
20 A. That's correct.
21 **Q. And the store contributed part of that**
22 **and you contributed part?**
23 A. That's correct.
24 **Q. And did you have insurance for both**
25 **yourself and your husband?**

Page 46

1 A. I did.
2 **Q. And was there a health, or excuse me, a**
3 **retirement plan of some sort?**
4 A. I had a 401(k).
5 **Q. And tell me your understanding of how**
6 **that worked when you were at Lowe's?**
7 A. They took a percentage out of my check
8 every week or every two weeks.
9 **Q. Do you know if they made a contribution**
10 **to that?**
11 A. They did. They would match, I don't know
12 what the matching was on it. I didn't really get
13 into that. I just know they matched what I put in
14 once I was a vested employee.
15 **Q. Do you know what percentage you had**
16 **withdrawn?**
17 A. I don't. Whatever the normal, because I
18 never changed it, went in and changed it or upped
19 it. So whatever the standard percentage is.
20 **Q. I think your records will probably**
21 **reflect that. Other than the health insurance and**
22 **contributions to your 401(k), did Lowe's provide**
23 **you with any other benefits?**
24 A. I had live insurance on myself, which I
25 believe was provided through Lowe's. And I had

Page 47

1 taken out life insurance on my husband.
2 **Q. Through Lowe's?**
3 A. Through Lowe's.
4 **Q. Did you pay for that out of your own**
5 **pocket?**
6 A. Yeah, it came out of my paycheck.
7 **Q. And do you know what Lowe's contribution**
8 **was to your life insurance program?**
9 A. I don't.
10 **Q. Who did you report to when you were**
11 **working as pricing coordinator?**
12 A. I reported to ASMs, any one of the ones
13 that worked there. Connie, Tina, Larry, Cheryl,
14 when they worked there. I also reported to Dustin
15 if I needed to, who is the store manager.
16 **Q. Was there anybody that was your direct**
17 **supervisor?**
18 A. Yeah, that changes so I'm not sure who it
19 was at the time. It could have been Stephanie.
20 It could have been Tina. It's, the way they do
21 things, it's kind of hard to determine who my
22 direct supervisor is. I just went to the people
23 who had authority to do things.
24 **Q. So if you had a question about how to do**
25 **your job, would any ASM do?**

Page 48

1 A. No. I went to, the pricing coordinator's
2 training site would give me all the information I
3 needed.
4 **Q. That was an online thing?**
5 A. Yeah, it was through Lowe's.
6 **Q. And if you had a question though, that**
7 **you needed to talk to a person at the Lowe's**
8 **store --**
9 A. I would go to a supervisor, yes.
10 **Q. And any of the assistant store managers?**
11 A. Yes.
12 **MR. CRIST:** Mark this, please.
13 (Whereupon, Exhibit No. 10 was marked for
14 purposes of identification.)
15 **BY MR. CRIST:**
16 **Q. Ms. Hoskin, I've handed you what we've**
17 **marked as Exhibit 10, which is a document I**
18 **suspect you haven't seen in a while. I'll give**
19 **you a minute to look at it.**
20 A. Yeah, I haven't seen it for awhile.
21 **Q. It's dated down at the bottom. I think**
22 **it's 10/14/06, do you see that?**
23 A. Yes, I do.
24 **Q. And do you recall signing this and**
25 **initialing this around the time you were first**

Page 49

1 hired at Lowe's?
2    A. Yes.
3    Q. And if we go down about halfway down
4 under Roman numeral II, it says I certify that I
5 have received a copy of the Lowe's orientation
6 guide, do you see that?
7    A. Yes.
8    Q. And you initialed that, did you not?
9    A. Yes, I did.
10    Q. And then down under number three it says,
11 "Lowe's Code of Ethics:  I acknowledge that I am
12 aware of, understand, and will comply with Lowe's
13 Code of Ethics as described in Lowe's Orientation
14 Guide and set forth in the Code of Ethics
15 Pamphlet."  And you initialed that, too?
16    A. I did.
17    Q. In the documents that you produced in
18 this case --
19       (Whereupon, Exhibit No. 11 was marked for
20 purposes of identification.)
21 BY MR. CRIST:
22    Q. I've handed you what we've marked as
23 Exhibit 11, which is the Employee Resource Guide,
24 New Employee Orientation and if we flip to the
25 next page, you'll see at the bottom it says

Page 50

1 January 2013.
2    A. It does.
3    Q. Okay.  Now, this of course wasn't,
4 Exhibit 11 wasn't what you received when you
5 signed Exhibit 10?
6    A. It was not.
7    Q. But did you get something like Exhibit 11
8 at the time you were first employed at Lowe's?
9    A. I got a book.
10    Q. Do you still have that book?
11    A. I do not.
12    Q. What happened to that?
13    A. It probably got thrown away when they
14 revised all of their policies and procedures.
15    Q. Do you remember there being a version of
16 the new employee orientation guide in that book
17 you got when you were employed?
18    A. There probably was.
19    Q. Do you remember getting a copy of Lowe's
20 code of ethics in that, in the materials you
21 received at time you were first hired?
22    A. I do.
23    Q. And did you read that stuff through when
24 you first got it?
25    A. I did.

Page 51

1    Q. Now, Exhibit 11, do you know how you
2 happened to get this?
3    A. I -- while I still had access to the
4 website, before it was taken away, I printed it
5 out.
6    Q. So tell me when you printed Exhibit 11.
7    A. In December.
8    Q. Okay.  And did you print it when issues
9 arose concerning your purchase of the other dryer?
10    A. No.
11    Q. What caused you in December of
12 2000 -- did you do it in December of 2014?
13    A. Yes.
14    Q. What caused you to print out the new
15 employee orientation guide in December of 2014?
16    A. I was terminated for something I didn't
17 do.
18    Q. So you went into the Lowe's website after
19 you were terminated and printed off Exhibit 11?
20    A. I did.
21    Q. Did you print off anything else?
22    A. I don't recall.
23    Q. Why did you go get this after you were
24 terminated?
25    A. So I had information for my case.

Page 52

1    Q. Okay.
2    A. The more information, the better off I
3 am.  I did not have the old employee handbook so I
4 thought it would be a smart thing to have the new
5 employee handbook.
6    Q. And I don't want to talk about any
7 communications you had with your lawyer or any
8 lawyer for that matter, but is this something you
9 did on your own or were you directed to do this?
10    A. No, I did it on my own.
11    Q. And do you remember when?
12    A. I do not.
13    Q. Was it within a week or so of when you
14 were terminated?
15    A. It was within a couple of days.
16    Q. Did you take any other Lowe's materials
17 with you when you were terminated?
18    A. No.  I was given nothing when I left.
19    Q. And is the new employee orientation the
20 only document that you printed off when you, after
21 you were terminated from their website?
22    A. Yes.  Well, no, I probably printed off,
23 you know, a paycheck stub or something like that,
24 that I had access to at the time.
25    Q. Is this a -- an intranet site where

1   Lowe's employees can go get stuff?
2   A.  Yes.
3   Q.  So somebody had given you a password or
4   access to it?
5   A.  No.  I had access to it for at least
6   three days after I was terminated.
7   Q.  That's what I mean.
8   A.  No, it was my password.
9   Q.  And let me just finish my question.
10  During the time you were employed at Lowe's, did
11  you have routine access to this intranet site?
12  A.  Yes.
13  Q.  Okay.  And that was because you were
14  employed and had a password?
15  A.  Yes.
16  Q.  And that password remained active for at
17  least a few days after you were employed?
18  A.  That's correct.
19  Q.  And did you ever try to go onto the site
20  later and discover your password didn't work?
21  A.  Of course I did.
22  Q.  And when did you try that?
23  A.  After four days or five days.
24  Q.  And were you looking for something else
25  afterwards?

1   A.  Information on my 401(k).  It redirects
2   you to a site that gives you information you can
3   print out on, in depth on, you know, how to access
4   your information on your 401(k) or information, it
5   gives you a whole list of things.
6   Q.  Okay.
7   A.  When you log in and you log in as a
8   former employee, and it redirects you to the
9   website.  It gives you phone numbers.
10  Q.  At some point, did you get a letter or
11  information, what we typically call a COBRA
12  notice, saying that you could continue your health
13  insurance if you wanted to at your own expense?
14  A.  I think I did.
15  Q.  Since December of 2014, have you had
16  health insurance?
17  A.  Yes.
18  Q.  And how did you replace the Lowe's
19  insurance?
20  A.  Through my husband.  My husband has me
21  insured.
22  Q.  Did you start that right after you got
23  terminated?
24  A.  I was already insured by his company.
25  Q.  Okay.  Tell me a little -- he works for

1   Knife River, which I think is owned by MDU,
2   correct?
3   A.  Yes.
4   Q.  And so at the time you were at Lowe's,
5   you were double insured, if you will?
6   A.  I guess.  I didn't know it at the time,
7   but yeah.
8   Q.  And what insurance, after you were
9   terminated, did it cost you anymore?  Did it cost
10  your family any more money to have you insured
11  through your husband's insurance?
12  A.  I don't know.
13  Q.  Is there a difference, have you noticed
14  any difference in the benefits you're provided
15  under your husband's insurance through Knife River
16  as opposed to you, to what you had at Lowe's?
17  A.  Difference in what manner?
18  Q.  Oh, co-pays cost more, prescriptions cost
19  more, that sort of stuff, or has it been about the
20  same?
21  A.  The way they bill, it's hard to determine
22  if the co-pays or are more or not.  It's submitted
23  to the insurance company and then we get a bill.
24  Q.  Okay.  Have you been continuously insured
25  under your husband's insurance since you left

1   Lowe's?
2   A.  Yes.
3   Q.  And as you sit here today, you don't know
4   whether you've had to pay any more out of pocket?
5   A.  My husband's insurance is based upon the
6   amount of hours he works.  So they have an hour
7   bank.  He has to work a minimum of 120 hours a
8   month to continue his insurance each month.  So
9   they are required to bank at least 11 to 14 hours
10  a year for us to be continually covered under his
11  insurance.
12  Q.  And have you been continually covered?
13  A.  As up to this date we missed one month
14  last year in 2015.  So we had no coverage for one
15  month.  And then they went back to work and got
16  our coverage back.
17  Q.  Is he in the union?
18  A.  No.
19  Q.  Here's what I'm trying to find out.  I
20  don't want it to be mysterious to you.  I'm just
21  trying to find out if it's cost you any money to
22  have insurance since you were let go at Lowe's.
23  Can you tell me one way or another whether it's
24  cost you or your family any more money for you to
25  have insurance?

Page 57

1   A.  I don't know that it's cost me anymore
2  money.
3   Q.  Okay.
4   A.  I don't have an answer for that question.
5      MR. CRIST:  Okay.  Why don't we take a
6  break.  We've been going for about an hour.
7      (Off the record.)
8  BY MR. CRIST:
9   Q.  Ms. Hoskin, looking at Exhibit 11, you
10 indicated that you had pulled this off the company
11 intranet.
12  A.  That's correct.
13  Q.  Are you sure you didn't get this from a
14 friend at Lowe's?
15  A.  I'm sure.
16  Q.  Let me have you look at page 11 of
17 Exhibit 11.  Do you see there where it's talking
18 about performance management and standards of
19 conduct job performance?
20  A.  Yes.
21  Q.  And it refers to what are called Class A
22 Instances of Misconduct, do you see that?
23  A.  Yes.
24  Q.  And do you see where it says, "These
25 serious violations normally result in immediate

Page 58

1  discharge"?
2   A.  Yes.
3   Q.  And the first of such Class A items is
4  dishonesty of any type.
5   A.  That's correct.
6   Q.  Would you agree with me that stealing
7  $562 in cash from Lowe's would be dishonest?
8   A.  Yeah, stealing $652 in cash from Lowe's
9  would be dishonest.
10  Q.  And would you also agree with me that
11 stealing $562 in merchandise from Lowe's would be
12 dishonest?
13  A.  Yes, it would.
14  Q.  And would you agree that an employee who
15 did either of those things ought to be fired?
16  A.  That's correct.
17  Q.  And another of the Class A violations,
18 it's down about halfway is, unauthorized
19 possession of company property, do you see that?
20  A.  Yes.
21  Q.  Let me have you go to the page that's
22 marked 32 at the very bottom.  And I should
23 probably go back a page.  This is the Lowe's code
24 of business conduct and ethics, do you see that?
25  A.  Yes.

Page 59

1   Q.  And you understood you were obligated to
2  comply with that, correct?
3   A.  Yes.
4   Q.  And then if we go over to the page that's
5  marked 32 at the bottom, it says protection about
6  halfway down, under I, it says, "Protection and
7  proper use of company assets."  It says,
8  "Employees, officers, and directors should protect
9  Lowe's assets and ensure their efficient use.
10 Theft, carelessness, waste, have a direct impact
11 on Lowe's profitability, company assets may only
12 be used for legitimate business purposes."  You
13 agree that's an appropriate part of that code of
14 ethics, correct?
15  A.  Yes.
16  Q.  And you understood you had to follow it?
17  A.  Pardon?
18  Q.  You understood you had to follow it, did
19 you not?
20  A.  I understood what?
21  Q.  That you had to follow the code of
22 ethics?
23  A.  Oh, yes.
24  Q.  Prior to being terminated have you ever
25 been disciplined or written up for anything at

Page 60

1  Lowe's?
2   A.  I had a write-up for when I was in
3  windows and walls for training issues.  They just
4  said it was, you know, training.  It wasn't
5  anything to worry about.
6   Q.  Okay.
7   A.  When you're first in a department and
8  you're learning stuff, you know, if you make a
9  mistake they call you in for a training write-up.
10 I was written up for -- in their words, spreading
11 rumors, which was not the case so.  But then I
12 wasn't the only one, so.
13  Q.  Okay.  So on the training issues when you
14 say you were written up, was it --
15  A.  If you were to complete an order incorrectly
16 and, you know, as you go through to correct it, if
17 you miss something, that's a training issue.
18  Q.  And then the gossiping was more of a
19 disciplinary type thing?
20  A.  Yeah, it was.  Yeah.
21  Q.  And what was it that Lowe's stated you
22 had done?
23  A.  That's all, they just said it was that,
24 it was, you know, spreading rumors and was not.
25  Q.  Did you believe you had been spreading

Page 61

1  rumors?
2     A.  No.  I asked questions.  Apparently
3  asking questions about someone is spreading
4  rumors.
5     Q.  Tell me a little bit more about that.
6  What did you do that they thought was spreading
7  rumors?
8     A.  An associate had worked there, had worked
9  there since I had worked there left abruptly one
10  day and we were concerned because she had health
11  issues so we asked questions.  And was it was me
12  and a couple other people, and apparently asking
13  the questions was not the right thing to do.
14     Q.  And so you got written up for that?
15     A.  Yes.  And they categorized it as
16  spreading rumors.
17     Q.  And you obviously disagreed with that?
18     A.  I did.
19     Q.  Did Lowe's have an employee purchase
20  policy?
21     A.  Yeah.
22     Q.  If you wanted to buy stuff as an
23  employee?
24     A.  Right.
25     Q.  Tell me your understanding of that

Page 62

1  policy.
2     A.  You would just purchase the item like any
3  normal person.  I mean, we had -- we got a
4  discount.  That was our, our perk for being an
5  employee.  We'd get, I believe it was a ten
6  percent discount off any purchase.  We didn't have
7  to go anywhere special to purchase it.  You know,
8  walk through the register line like anybody else.
9     Q.  Did you ever see a copy, a written copy
10  of the employee purchase policy?
11     A.  I'm sure I did.
12        MR. CRIST: Let's mark this, please.
13        (Whereupon, Exhibit No. 12 was marked for
14  purposes of identification.)
15  BY MR. CRIST:
16     Q.  Ms. Hoskin, we've handed you what's been
17  marked as Exhibit 12, the Lowe's Employee
18  Purchases Policy, give you just a minute to kind
19  of look through that.
20        Do you think you've seen this or an
21  earlier version of this during your time at
22  Lowe's?
23     A.  Yes.
24     Q.  And did you understand that you had to
25  follow this policy if you wanted to make purchases

Page 63

1  using your discount?
2     A.  Yes.
3     Q.  Let me have you go to the second page at
4  the particular Item G.  First thing it says, it
5  says, "REV, All merchandise purchased by employees
6  must be processed at default employee prices."  Do
7  you see that?
8     A.  Yes.
9     Q.  What did you understand that to mean?
10     A.  That you got your 10 percent discount.
11     Q.  And where it says on number one there, it
12  says, "All items are 10 percent off the lowest,
13  and it's ECP, MSP, LMP, advertised or builder
14  price."  Do you know what those designations
15  meant?
16     A.  Yes.
17     Q.  Tell me what they meant.
18     A.  LMP is Lowest Market Price.  I don't
19  remember what the other two are, but.
20     Q.  Okay.  Now, number three talks about
21  damaged, discontinued, no rebuy, clearance
22  seasonal closeout, return, what's returned SOS?
23     A.  Special, special order items are SOS.
24     Q.  Okay.  And "Store relocation sell down
25  must be sold at 10 percent off the price

Page 64

1  established for retail customers."  Do you see
2  that?
3     A.  Yes.
4     Q.  Okay.  And what -- tell me what that
5  means.
6     A.  Ten percent off of the price.
7     Q.  So if there's a barbecue grill that's on
8  clearance for 200 bucks --
9     A.  You get ten percent off.
10     Q.  And is it appropriate for store employees
11  to sort of squirrel away clearance items so
12  customers can't see them?
13     A.  It's not appropriate, no.  It happens,
14  yes?
15     Q.  Have you ever seen it happen?
16     A.  I've seen people put things in places
17  that were not in the right place.
18     Q.  For the purposes of being able to buy
19  them later at clearance?
20     A.  No.  For the purpose of buying them when
21  they get off work.
22     Q.  Have you ever, I'll use my term,
23  squirrelled away any item so that you could buy it
24  using your discount?
25     A.  No.  I mean, we don't know, I never knew

Page 65

1   what was going to be clearanced or when it was
2   going to be clearanced.  So there was no reason to
3   put anything aside waiting for it to go on
4   clearance.
5      Q.  Once something went on clearance though,
6   you knew about it, correct?
7      A.  Well, yeah, I'd see it in the morning.
8      Q.  You were the first person to know about
9   it weren't you?
10     A.  Well, no, I wasn't.  Back east in New
11  York was the first people so see it in clearance.
12     Q.  Okay.  But you're --
13     A.  Yes.
14     Q.  You would be the -- let me get my
15  question out here.
16     A.  Yes, I would be the first person to see
17  it.
18        MR. COBURN: Just make sure he asks the
19  question.
20        MR. CRIST: Yeah, I just want to get my
21  question out.  You and I know what we just said,
22  but the record is garbled.
23  BY MR. CRIST:
24     Q.  When items went on clearance in the
25  Billings store, you as the pricing coordinator the

Page 66

1   would be the first person to see that they were
2   being placed on clearance, correct?
3      A.  Yes.
4      Q.  And in fact, it was your job then to do
5   what was necessary to ensure that the clearance
6   prices got placed on these items, correct?
7      A.  Yes.
8      Q.  So if, for example, a dryer went on
9   clearance, you would be the first person to know
10  that dryer was on clearance?
11     A.  Yes.
12     Q.  And did you ever put, you actually ended
13  up with two dryers in connection, one that didn't
14  work and then the second one, buying two different
15  dryers, correct?
16     A.  Yes.
17     Q.  And with respect to either of those
18  dryers, had you placed that dryer aside after you
19  found out it was on clearance so that you could
20  buy it later?
21     A.  No.
22     Q.  Let me talk with you a little bit about
23  the events that, with respect to these two dryers
24  now.  You bought the first dryer, I think on
25  October 29th of 2014, does that sound right?

Page 67

1      A.  That's correct.
2        MR. CRIST: Go ahead and mark this,
3   please.
4        (Whereupon, Exhibit No. 13 was marked for
5   purposes of identification.)
6   BY MR. CRIST:
7      Q.  Ms. Hoskin, I've handed you what we've
8   marked as Exhibit 13.  And do you recognize that
9   as the receipt?
10     A.  Yes.
11     Q.  For the first dryer that you purchased
12  from Lowe's?
13     A.  Yes.
14     Q.  And if I'm reading this correctly, and
15  I'm going to do a little math here.  It looks like
16  the price of the dryer was about $129 and then you
17  got $12.98 off being your ten percent discount,
18  correct?
19     A.  That's correct.
20     Q.  And did you then have that dryer
21  delivered to your house?
22     A.  I did.
23     Q.  And when you plugged it in and started to
24  use it, it didn't work, right?
25     A.  It didn't heat.

Page 68

1      Q.  It didn't work?
2      A.  Everything else worked.  It just didn't
3   heat.
4      Q.  Yeah, pretty important part of a dryer
5   though?
6      A.  Yes.
7      Q.  And was it like that right off the bat?
8      A.  The first time I used it, yes.
9      Q.  And so what did you want to do with that
10  dryer?
11     A.  I wanted to exchange it for another.
12     Q.  Now, I think the records reflect that you
13  got the second dryer on the 6th of November, does
14  that sound right?
15     A.  That sounds right.
16     Q.  So how long after you bought this on the
17  29th until you got it home?
18     A.  Believe it was delivered that weekend.
19     Q.  I don't have a calendar.
20     A.  I think it would have been -- I don't
21  have a calendar either, but it would have
22  been -- would have been, I would say maybe
23  November 1st.
24     Q.  And when they brought you the new dryer,
25  did they just take the old one, did they do that

Page 69

1  all in one trip?
2     A.  Yes.
3     Q.  Okay.  So you would have swapped them out
4  after November 6th, physically swapped them out of
5  your house after November 6th?
6     A.  The first dryer or the second dryer?
7     Q.  Well, if you bought the second one on
8  November 6th --
9     A.  Right.
10    Q.  You would have physically swapped them
11 out after that?
12    A.  That's correct.
13    Q.  So when your first one didn't work, you
14 wanted to exchange it, you wanted another?
15    A.  That's correct.
16    Q.  There's a lot of -- there's a few
17 conversations you had, I know some with Connie
18 Crawford, some with Phil Bartzer.  I want to get
19 into the details of those, but what I want to
20 understand first is kind of the sequence of things
21 in terms of who you talked to first.  And then
22 once I have that sequence, then I went to go into
23 each conversation, okay?
24    A.  Uh-huh.
25    Q.  So when you came into the store who's the

Page 70

1  first person that you talked to, that you remember
2  talking to about exchanging the dryer that didn't
3  work for one that did work?
4     A.  I believe it was Connie.
5     Q.  And did that conversation occur in
6  Connie's office?
7     A.  It did.
8     Q.  And who's the next person you talked to?
9     A.  Phil Bartzer.
10    Q.  And where did that conversation occur?
11    A.  In the appliance department.
12    Q.  And was there a phone call between Phil
13 and Connie while you were standing there with
14 Phil?
15    A.  There was.
16    Q.  And after the phone call, who is's the
17 next person you talked to?  Did you go back and
18 talk to Connie?
19    A.  No.
20    Q.  Okay.  Did you talk with anybody else?
21    A.  About the dryer, no.
22    Q.  So all of your communications with
23 respect to swapping the one dryer for the other,
24 you had one in person with Connie, one in person
25 with Phil, and then you were physically present

Page 71

1  while Phil was on the phone with Connie?
2     A.  I was.
3     Q.  When the -- you understood that Adam
4  Cowan approved the write down?
5     A.  I found that out after the fact.
6     Q.  And so you weren't physically present
7  when the -- I'm not using the right word I
8  think -- when the approval was done up front, is
9  that right?
10    A.  No.
11    Q.  Okay.  So let's talk about your first
12 conversation with Connie.  What time of the day
13 was it?
14    A.  It was in the morning first thing.
15 Between seven and eight, I guess.
16    Q.  And was there anybody in Connie's office
17 other than you and Connie?
18    A.  No.
19    Q.  And just start at the beginning of that
20 conversation and walk me through what happened.
21    A.  I went to Connie and told her that I had
22 purchased a dryer and the dryer didn't work so I
23 needed to exchange it for another.  I asked, you
24 know, how do we go about doing this if there's not
25 another exact dryer in our store that's the same

Page 72

1  item number for me to exchange it for, can I just
2  exchange it for a dryer of my choosing.
3     Q.  What did she say?
4     A.  She asked what dryer I had in mind and I
5  told her it was a Whirlpool Cabrio.  She asked how
6  much it was and I said right now it's on sale for,
7  I think at the time it was 354 or 364.  I don't
8  recall.  And she said, well, that would all be too
9  much to exchange it for.  Now, I said, okay, so
10 what do you want me to do.  And she said, well,
11 get with whoever is in appliances, look at the NPI
12 list, which is the Nonproductive Inventory list.
13 And find a dryer that's comparable to the one
14 you're returning and have Phil give me a call and
15 we'll go from there.
16    Q.  And then did you leave her office?
17    A.  I did.
18    Q.  Did you tell Connie how much you had paid
19 for the dryer that didn't work?
20    A.  I don't recall if I told her how much I
21 paid for it or not.
22    Q.  You said that you were interested in
23 trading, what kind of dryer, what was the dryer
24 that didn't work?
25    A.  The dryer I had was a Samsung.

Page 73

1     Q.  And you said you told her that you were
2   interested in trading the Samsung in for a
3   Whirlpool?
4     A.  Right.  Exchanging it for a Whirlpool,
5   yes.
6     Q.  How did you know there was a Whirlpool
7   you were interested in?
8     A.  I have -- I had a Whirlpool Cabrio
9   washer.  Because I do price changes, I know that
10  they were on sale at the time.  And it was the
11  only dryer that I could see that was close enough
12  to the price that, you know, I had paid.
13        My knowledge of an exchange if you can't
14  find the same item to just exchange it for
15  straight across, then you exchange it for a
16  different item and then if you have to pay the
17  difference, that's what you do.
18    Q.  So when you were talking to Connie you
19  understood that if the dryer you were acquiring,
20  the replacement was more than $116?
21    A.  I would have to pay the difference, yes,
22  I knew that at the time.
23    Q.  Now, you didn't end up paying the
24  difference, did you?
25    A.  No.  I was told that I had to look at the

Page 74

1   nonproductive inventory list and choose a dryer
2   from that list that was comparable to the one I
3   was returning.  That I couldn't exchange it for a
4   stock item.
5     Q.  What you've referred to, the NPI or the
6   nonproductive inventory list, tell me what that
7   is.
8     A.  It's a list of appliances that are on
9   clearance either because they're not productive,
10  they're not selling well, and the company is
11  blowing them out.  Or they're, the models have
12  been upgraded so they're no longer a current
13  model.
14    Q.  And was the Whirlpool Cabrio, did you
15  know if it was on the NPI list?
16    A.  It was not.  It was a stock item.
17    Q.  Did Connie tell you you couldn't, you
18  know, go get a stock item and pay the difference
19  and take the stock item?
20    A.  I'm going to say yes.  She told me I
21  could not choose a stock item to exchange it for.
22    Q.  Even if you paid the difference?
23    A.  Paying the difference didn't even come up
24  in our conversation.  I assumed that's what I
25  would have to do.  That was not even a part of our

Page 75

1   conversation.
2     Q.  So you told, she told you to go talk to
3   Phil Bartzer?
4     A.  Yes.
5     Q.  And what was Phil Bartzer's job?
6     A.  Phil was an appliance specialist.
7     Q.  And tell me again what Connie told you to
8   do with Phil.
9     A.  She told me to get with Phil, have him
10  print out the NPI list, go over the list, find a
11  dryer that was comparable to what I was returning
12  and to call, have him call her with the
13  information.
14        (Whereupon, Exhibit No. 14 was marked for
15  purposes of identification.)
16  BY MR. CRIST:
17    Q.  Ms. Hoskin, I've handed you what we've
18  marked as Exhibit 14.  And do you recognize that
19  as a statement you were asked to prepare on
20  November 10th of 2014?
21    A.  Yes.
22    Q.  And this has to do with the issue of
23  swapping out the dryers, does it not?
24    A.  That's correct.
25    Q.  And this is in your handwriting and

Page 76

1   signed by you?
2     A.  It is.
3     Q.  Where you say you "Bought a dryer on
4   clearance, the dryer did not work so I asked about
5   getting another clearance dryer at the same price.
6   Talked to Connie and she said to have Phil pull a
7   clearance nonstock report."  Is that the same as
8   the NPI report?
9     A.  Yes.
10    Q.  Okay.  So after you left and she said,
11  and then you say, "After after finding a dryer,
12  Phil B. called Connie and asked just how to do the
13  swap due to the dollar difference."
14    A.  He did.
15    Q.  Okay.  Let's -- so it was just you and
16  Connie in her office, correct?
17    A.  Yes.
18    Q.  So you left Connie, did you go right over
19  to talk to Phil?
20    A.  I did.
21    Q.  And was it just the two of you there?
22    A.  Yes.
23    Q.  Okay.  And that was over near his
24  workstation?
25    A.  Yes.

Page 77

1  Q. Tell me, again, start at the beginning
2  and tell me about your conversation with Phil
3  Bartzer.
4  A. I told Phil that the dryer I had
5  purchased that was clearance didn't work and I had
6  already talked to Connie. Connie told me to have
7  you pull the NPI list and we were to go over it to
8  find a dryer that was comparable to what I was
9  returning. So he pulled it, we went over it, and
10 the only one that was comparable -- now she didn't
11 say comparable in price or comparable in
12 functionality. So we just kind of went in
13 between. And I said, well, that's the only thing
14 that's there. And so he called her.
15 Q. And what dryer did you find?
16 A. It was an LG.
17 Q. Okay. And you were there while Phil was
18 talking to Connie?
19 A. I was.
20 Q. And you, of course, could hear Phil's end
21 of the conversation?
22 A. Yes.
23 Q. Could you hear what Connie said?
24 A. I could not.
25 Q. From the one side that you could hear,

Page 78

1  tell me what you remember.
2  A. He told her what dryer that we had found
3  and it was an LG, he told her what the price was.
4  And then he said, yeah, yeah, okay, okay, yeah,
5  okay, and that was it.
6  Q. And when he hung up the phone what did he
7  say to you?
8  A. He didn't say anything because at that
9  point I had walked away.
10 Q. Why did you walk away?
11 A. I needed to get back to work. I was only
12 on my break. And so he looked at me and he says,
13 okay, I'm going to go take care of this. And I
14 said okay.
15 Q. Did he tell you, did Phil say anything to
16 you about what Connie had said to him?
17 A. He did not.
18 Q. Did he ever?
19 A. No.
20 Q. So do you know whether Connie approved or
21 disapproved of the purchase?
22 A. I do not.
23 Q. Going back to your statement there, the
24 last sentence, last two sentences, you say
25 "Phil B. called Connie to ask how to do the swap

Page 79

1  due to the dollar difference. It is my
2  understanding from the phone call, Phil was to
3  swap it straight across one dryer for another."
4  A. That's what I assumed took place.
5  Q. And that's my point. If you didn't hear
6  what Connie said and you walked away before the
7  phone call even ended, how did you know that
8  Connie had approved a straight across swap without
9  you having to pay the difference?
10 A. Because Phil came back about 10,
11 15 minutes later with the receipt and said, it's
12 all taken care of, it's set up for delivery,
13 here's your receipt.
14 Q. Did you ever ask Phil what Connie said?
15 A. I did not.
16 Q. But you left before the conversation
17 ended, correct?
18 A. That's correct.
19 Q. And went back to work. And then is it
20 your understanding that Phil then took care of the
21 exchange?
22 A. Yes.
23 Q. And he came back and gave you a receipt?
24 A. Yes.
25    MR. CRIST: Will you mark this, please.

Page 80

1     (Whereupon, Exhibit No. 15 was marked for
2  purposes of identification.)
3  BY MR. CRIST:
4  Q. I'm handing you what's marked Exhibit 15.
5  Is that a second statement that you prepared?
6  A. Yes.
7  Q. And it looks like this was prepared on
8  December 12th of 2014, correct?
9  A. Yes.
10 Q. Is it in your handwriting and signed by
11 you?
12 A. Yes.
13 Q. How is it that you happened to be doing
14 this statement?
15 A. The store manager, Dustin, asked me in
16 and asked me three questions. Those were the
17 answers to the three questions he asked.
18 Q. I should have asked you, the Exhibit
19 No. 14, who asked you to fill that out?
20 A. Tina, who was an ASM called me in and
21 asked me how the -- the conversation I had with
22 Connie.
23 Q. Let's talk a bit about that. Did Tina
24 call you in on 10th, November 10th?
25 A. Yes.

Page 81

1   Q.   The same day this was dated?
2   A.   Yes.
3   Q.   Okay.  Was it just you and Tina?
4   A.   I don't remember.  I think there was
5   somebody else in there, but I don't remember who
6   it was.
7   Q.   And tell me, tell me about that.  What
8   happened?  Just, again, start at the beginning and
9   kind of walk me through what happened.
10   A.   She asked me about the conversation that
11   I had with Connie about the dryer.  And what you
12   see on my statement is what I wrote down.
13   Q.   When you left your conversation with
14   Connie, did you understand that if the replacement
15   dryer was more expensive than the one you had
16   purchased, that you would have to pay the
17   difference?
18   A.   I assumed that, yes.
19   Q.   And that's because that's what Connie
20   said to you, right?
21   A.   No.
22   Q.   But you assumed that because you knew you
23   couldn't just take company property?
24   A.   That's correct.  I assumed that because
25   exchanges don't work that way unless it's the same

Page 82

1   item.
2   Q.   So when -- why did you later think it was
3   okay for you to get a more expensive item without
4   having to pay for the difference?
5   A.   It wasn't my decision whether I thought
6   it was okay or not.  It wasn't my decision.
7   Q.   Did you ever say to somebody, hey, don't
8   I have to pay the difference?
9   A.   I might have said that to Phil.  I don't
10   remember.
11   Q.   Do you remember saying it to Connie or
12   anybody else?
13   A.   No.
14   Q.   So when you went and sat with Tina, did
15   she ask you questions before she had you fill out
16   the statement?
17   A.   No, she just asked about the dryer and
18   what conversation I had with Connie.  She goes,
19   could you please write it down, and I'd said yes.
20   Q.   And did she ask about your conversations
21   with Phil?
22   A.   No.
23   Q.   But you just went ahead and just wrote
24   that down any way?
25   A.   Because she asked me what my conversation

Page 83

1   was.  So Connie telling me to go talk to Phil was
2   part of the conversation so it seemed to be
3   appropriate to list everything.
4   Q.   Anything else you remember about that
5   conversation with Tina?
6   A.   No.
7   Q.   Then going back to Exhibit 15, you said
8   this involved, you did this in a conversation with
9   Dustin, the manager?
10   A.   Yes.
11   Q.   And was there anything anybody else in
12   the room with Dustin?
13   A.   There was.
14   Q.   Do you remember who?
15   A.   I do not.
16   Q.   Was there more than one person?
17   A.   No.
18   Q.   And you said, I guess I kind of
19   interrupted you, you started to say Dustin said he
20   had three questions for you.
21   A.   Yes.
22   Q.   And what was the first question?
23   A.   The first question was, was it a
24   corporate markdown.  And I said, yes, it was not a
25   handwritten tag, it was a corporate markdown.

Page 84

1   Q.   And do you know why that would be of
2   significance?
3   A.   I don't.
4   Q.   And what was the second question he asked
5   you?
6   A.   What Connie asked me to do with the NPI.
7   And I said Connie said to, well, you know, Connie
8   said no on the stock item, that I had to pull the
9   NPI list and choose from nonproductive inventory.
10   And then he asked if that was a normal markdown.
11   And I said, well, no, but it wasn't my decision.
12   Q.   Okay.  And that's what you've written
13   here you said, "No, not normally marked down for
14   that much of a difference."
15   A.   That's correct.
16   Q.   So you understand now the difference was
17   over $500, correct?
18   A.   Yes.
19   Q.   And you knew at the time you acquired
20   the, that you exchanged the two dryers, that it
21   was unusual for a markdown to be that high,
22   correct?
23   A.   That's correct.
24   Q.   And you knew that, your expectation was
25   that you would have to pay the difference?

1    A.  I would.
2    Q.  **So why didn't you ever go pay the**
3  **difference?**
4    A.  I wasn't asked to.  I didn't process it.
5  It wasn't my decision to change the price on the
6  item.  So I felt not obligated to offer that up.
7  If they wanted me to pay the difference then it
8  should have been processed in the manner in which
9  I would have to pay the difference.  It wasn't.
10  It was not my decision to change the price.  I
11  left it in their hands.  They chose to process it
12  in the manner of which it was processed.  At that
13  point in time, I was a regular customer.  A
14  regular customer is going to think the same thing.
15  You make the decision.  I follow it.
16    Q.  **Anything else you remember from the**
17  **conversation with Dustin?**
18    A.  No.  That particular one, no.
19    Q.  **Did you have a later conversation with**
20  **Dustin?**
21    A.  When he terminated me.
22    Q.  **And how long, I think the termination**
23  **occurred on the 13th, is that right?**
24    A.  No, on the 16th.
25    Q.  **We might both be wrong.  It might be the**

1    **14th.  The 16th, you're correct, thank you.  After**
2    **your meeting with Dustin, did you just go back to**
3    **work?**
4    A.  When he terminated me?
5    Q.  **No, after the --**
6    A.  Oh, this one here, yes.
7    Q.  **Okay.  Did Dustin, let's talk about the**
8    **termination meeting on the 16th.  Did someone ask**
9    **you to come to Dustin's office?**
10    A.  He did.
11    Q.  **Okay.  And who was in there?**
12    A.  I believe Tina was in there.
13    Q.  **So Tina, Dustin, and you?**
14    A.  Yes.
15    Q.  **Do you remember what time of day it was?**
16    A.  It was between 11 and noon.
17    Q.  **And just again start at the beginning of**
18    **the meeting and walk me through what happened.**
19    A.  He called me into his office and he said
20  that he had concluded his investigation and that
21  what he had determined was that I had cost the
22  company a loss of $562 and that was unacceptable
23  and therefore I was terminated.
24    Q.  **And what did you say in response to that?**
25    A.  I looked at him and I said back the horse

1  up to the cart here.  I had nothing to do with the
2  price change.  Nobody asked me to pay the
3  difference, it wasn't processed in that manner.
4  And he said, nonetheless, it cost the company a
5  loss and you're terminated.
6    Q.  **What happened then?**
7    A.  I said okay.  You'll be hearing from my
8  attorney.
9    Q.  **Did Tina say anything during the meeting?**
10    A.  No.
11    Q.  **And do you recall anything else occurring**
12  **in the meeting other than what you've just told**
13  **me?**
14    A.  Nope.
15       **MR. CRIST:** Mark that, please.
16       (Whereupon, Exhibit No. 16 was marked for
17  purposes of identification.)
18  BY MR. CRIST:
19    Q.  **Ms. Hoskin, I've handed you what we've**
20  **marked as Exhibit 16.  Do you recall seeing the**
21  **first two pages of Exhibit 16 in the termination**
22  **meeting?**
23    A.  No.  Actually, I didn't look at it.
24    Q.  **Do you remember that it was physically**
25  **there?**

1    A.  Yes, it was present.
2    Q.  **Okay.  But you didn't read it?**
3    A.  No.
4    Q.  **It says on the back employee refused to**
5  **sign.  Did they give this to you and ask you to**
6  **sign it?**
7    A.  They did.
8    Q.  **And did you refuse?**
9    A.  Yes, I did.
10    Q.  **And you did so without reading it?**
11    A.  I did.
12    Q.  **I'm saying --**
13    A.  Yes, I did.
14    Q.  **And were these attachments attached to**
15  **it, do you know?**
16    A.  Honestly, I don't recall.  I don't
17  believe they were.  I believe it was just these
18  two pages right here.
19    Q.  **Let me have you look at the last page.**
20  **It's marked on the side there, Lowe's 122.  And do**
21  **you know what this report is?**
22    A.  It's -- it's an override report, I
23  believe.
24    Q.  **Okay.  And the first item up there, it**
25  **says Phil Bartzer and it identifies a LG dryer,**

Page 89

1  correct?
2     A.  Correct.
3     Q.  And that's the one you swapped for the
4  one that didn't work?
5     A.  Correct.
6     Q.  And shows that the price difference was
7  $562, do you see that?
8     A.  Correct.
9     Q.  And at the time that you and Phil had
10 identified the LG dryer, you knew that its price
11 was $679, didn't you?
12    A.  That's correct.
13    Q.  And so at the time you swapped it, you
14 knew that if the swap was approved without you
15 paying that, you would be getting a $562 benefit,
16 correct?
17    A.  Yes.
18    Q.  Had you ever heard of anybody else in the
19 store being given over $500 worth of free stuff
20 from Lowe's?
21    A.  No.
22    Q.  Is the termination meeting the last time
23 you've been in the Lowe's store?
24    A.  Yes.
25    Q.  And have you talked with anybody in

Page 90

1  Lowe's management since then?
2     A.  No.
3     Q.  Have you talked with other Lowe's
4  employees since your termination?
5     A.  If I run into them in the store, yes.
6     Q.  Have you talked to anybody within Lowe's
7  about any issues relating to your employment or
8  your termination?
9     A.  I don't believe so.
10       MR. CRIST:  Why don't we take a break, I
11 might be about done.
12       (Off the record.)
13 BY MR. CRIST:
14    Q.  When you came, after the first dryer
15 didn't work and you came back looking to swap out
16 another dryer, you told me that the first person
17 you talked to was Connie and you'd had a
18 conversation in her office, correct?
19    A.  Uh-huh.
20    Q.  That was a "yes"?
21    A.  Yes.
22    Q.  And had you talked to Phil at all about
23 what he had in stock before you talked to Connie?
24    A.  I might have.  I don't remember.
25       MR. CRIST: That's all I have.

Page 91

1        THE WITNESS: Okay.
2        MR. CRIST: Want her to read and sign?
3        MR. COBURN: Yeah, read and sign,
4  definitely.
5            - - -
6        (Thereupon, the deposition was concluded
7  at 10:32 a.m., on Tuesday, March 15, 2016.)
8            - - -
9        SIGNATURE REQUIRED

Page 92

1              DEPONENT'S CERTIFICATE
2
3     I, CARRIE HOSKIN, the deponent in the
4  foregoing deposition, DO HEREBY CERTIFY, that I
5  have read the foregoing - 92 - pages of
6  typewritten material and that the same is, with
7  any changes thereon made in ink on the correction
8  sheet and signed by me, a full, true and correct
9  transcript of my oral deposition given at the time
10 and place hereinbefore mentioned.
11
12       _____
13              CARRIE HOSKIN
14    SUBSCRIBED AND SWORN TO before me this___ day
15 of _____, 2016.
16
17
18
19       _____
20       Notary Public State of Montana
         Print Name_____
21       Residing in:
         My Commission expires:
22
23 CARRIE HOSKIN vs. LOWE'S HOME CENTERS, LLC
24
25

**$**

**$0.05 (1)**
41:12
**$116 (1)**
73:20
**$12.98 (1)**
67:17
**$129 (1)**
67:16
**$19,465.42 (1)**
43:15
**$19,846.27 (1)**
44:7
**$21,337.98 (1)**
44:16
**$500 (2)**
84:17;89:19
**$562 (5)**
58:7,11;86:22;89:7,
15
**$652 (1)**
58:8
**$679 (1)**
89:11
**$8.05 (1)**
36:1

**\***

**\*\*\*\*\*\*\*\* (1)**
5:3

**A**

**ability (1)**
7:5
**able (1)**
64:18
**abruptly (1)**
61:9
**absolutely (1)**
6:13
**access (6)**
51:3;52:24;53:4,5,
11;54:3
**account (1)**
30:25
**acknowledge (1)**
49:11
**acknowledging (2)**
22:11;23:15
**acquired (1)**
84:19
**acquiring (1)**
73:19
**across (3)**
73:15;79:3,8
**activate (1)**
41:16
**activated (2)**
40:10,18

**activating (1)**
40:24
**active (2)**
11:23;53:16
**actually (4)**
19:22,25;66:12;
87:23
**Adam (1)**
71:3
**additional (1)**
28:20
**address (2)**
17:22;31:23
**advertised (1)**
63:13
**afternoon (1)**
45:3
**afterwards (2)**
6:3;53:25
**again (14)**
12:1;19:8;22:10,17;
23:10;27:19;28:1,8;
32:1;33:21;75:7;77:1;
81:8;86:17
**against (1)**
5:14
**ages (1)**
7:19
**ago (1)**
8:16
**agree (4)**
58:6,10,14;59:13
**ahead (3)**
14:19;67:2;82:23
**along (1)**
18:25
**always (5)**
6:14;12:19;42:8,9;
44:1
**America (3)**
10:9;11:10;12:10
**amongst (1)**
42:12
**amount (2)**
37:1;56:6
**answered (1)**
14:3
**anymore (2)**
55:9;57:1
**apparel (1)**
24:6
**apparently (4)**
21:2;26:12;61:2,12
**appeared (1)**
16:23
**appears (4)**
18:19;27:19;28:10;
36:24
**appliance (2)**
70:11;75:6
**appliances (2)**
72:11;74:8
**application (9)**

15:20;16:19;20:6;
22:11,21;23:5,15;
26:15,24
**applications (7)**
14:18,21;15:14;
16:16;17:1,2;28:21
**applied (33)**
16:12,20;17:11,21,
21,23;18:19;19:15;
20:2,5;21:16;23:8;
24:8;25:24;26:8,12;
27:17;28:1,8;31:22,23;
32:7;33:14,18,19,19,
21,24;34:1,4,7,9;40:4
**apply (8)**
22:19;25:10,23,24;
30:19;31:17;34:23;
38:18
**applying (2)**
26:7;31:13
**appropriate (4)**
59:13;64:10,13;83:3
**approval (1)**
71:8
**approved (4)**
71:4;78:20;79:8;
89:14
**approximately (1)**
29:8
**area (1)**
42:11
**arose (1)**
51:9
**around (4)**
7:22;9:14;25:4;
48:25
**aside (2)**
65:3;66:18
**ASM (1)**
47:25;80:20
**ASMs (1)**
47:12
**assets (3)**
59:7,9,11
**assist (1)**
25:3
**assistant (1)**
48:10
**associate (3)**
9:8;12:7;61:8
**assume (1)**
26:20
**assumed (5)**
74:24;79:4;81:18,22,
24
**attached (1)**
88:14
**attachments (1)**
88:14
**attorney (3)**
5:13;17:4;87:8
**Auburn (1)**
9:21

**audibly (1)**
6:11
**August (1)**
7:12
**authority (1)**
47:23
**automatically (1)**
40:19
**aware (1)**
49:12
**away (9)**
8:17;39:8;50:13;
51:4;64:11,23;78:9,10;
79:6
**awhile (1)**
48:20

**B**

**back (27)**
17:10;19:17;22:16,
23;23:5,14;25:13;
26:17;27:1;32:20;
33:13;34:16;56:15,16;
58:23;65:10;70:17;
78:11,23;79:10,19,23;
83:7;86:2,25;88:4;
90:15
**background (2)**
6:25;12:2
**Bank (6)**
10:9;11:9,18;12:10;
56:7,9
**banking (1)**
12:1
**barbecue (1)**
64:7
**Bartzer (3)**
69:18;70:9;75:3;
77:3;88:25
**Bartzer's (1)**
75:5
**Based (2)**
14:5;56:5
**basic (1)**
6:5
**basically (1)**
29:24
**bat (1)**
68:7
**became (1)**
8:16;45:8
**beginning (4)**
71:19;77:1;81:8;
86:17
**benefit (1)**
89:15
**benefits (5)**
36:12;45:15,18;
46:23;55:14
**better (1)**
52:2
**bigger (1)**

10:25
**bill (2)**
55:21,23
**Billings (2)**
35:10;65:25
**bills (1)**
29:20
**bit (12)**
5:19;13:23;15:22;
16:15;18:13;27:6;
28:17;38:9,15;61:5;
66:22;80:23
**blaming (1)**
26:7
**blinds (1)**
39:25
**blowing (1)**
74:11
**book (3)**
50:9,10,16
**booklet (1)**
5:23
**boring (1)**
11:22
**born (1)**
7:9
**borrowing (1)**
29:25
**both (4)**
5:22;11:19;45:24;
85:25
**bottom (5)**
22:14;48:21;49:25;
58:22;59:5
**bought (4)**
66:24;68:16;69:7;
76:3
**Brach's (1)**
15:3
**break (5)**
37:21,22;57:6;78:12;
90:10
**breaks (2)**
12:22,23
**Brian (1)**
7:16
**broken (1)**
13:10
**Bronc's (14)**
15:1,4,5,19;29:4;
32:5;33:15,25;34:9,13;
35:14;36:5;37:15,25
**brother (2)**
30:17;38:17
**brother's (1)**
38:20
**brought (1)**
68:24
**bucks (1)**
64:8
**builder (1)**
63:13
**building (1)**

11:1
**business (9)**
9:16,17,20;10:6,7,
14;12:1;58:24;59:12
**buy (4)**
61:22;64:18,23;
66:20
**buying (2)**
64:20;66:14

## C

**Cabrio (3)**
72:5;73:8;74:14
**calendar (2)**
68:19,21
**California (5)**
7:10,23;9:21,22;
24:20
**call (13)**
19:7;20:8;21:3;
54:11;60:9;70:12,16;
72:14;75:12,12;79:2,7;
80:24
**called (7)**
5:6;57:21;76:12;
77:14;78:25;80:20;
86:19
**came (9)**
9:2,13;13:1;47:6;
69:25;79:10,23;90:14,
15
**can (10)**
6:1;18:25;20:6;25:7;
28:16;40:13;53:1;54:2;
56:23;72:1
**cards (2)**
29:23,25
**care (9)**
78:13;79:12,20
**carelessness (1)**
59:10
**CARRIE (1)**
5:5
**cart (1)**
87:1
**case (5)**
5:14;7:4;49:18;
51:25;60:11
**cash (3)**
12:6;58:7,8
**cashier (4)**
23:1;32:11;38:14;
39:1
**cashiered (1)**
10:24
**cashiers (1)**
30:18
**categorized (1)**
61:15
**caused (2)**
51:11,14
**certify (1)**

49:4
**chance (3)**
5:19,24;6:2
**change (4)**
41:23;85:5,10;87:2
**changed (5)**
36:7;40:18;42:4;
46:18,18
**changes (6)**
6:1;40:11;42:18,19;
47:18;73:9
**changing (2)**
40:25;41:14
**charge (2)**
24:2;25:1
**chat (1)**
5:19
**check (2)**
9:9;46:7
**Cheryl (1)**
47:13
**choose (4)**
11:25;74:1,21;84:9
**choosing (1)**
72:2
**chose (1)**
85:11
**chronological (1)**
16:25
**circumstances (1)**
21:24
**Class (3)**
57:21;58:3,17
**clear (1)**
6:3
**clearance (24)**
41:20,24;42:2,6,12,
15;63:21;64:8,11,19;
65:4,5,11,24;66:2,5,9,
10,19;74:9;76:4,5,7;
77:5
**clearanced (2)**
65:1,2
**close (1)**
73:11
**closeout (1)**
63:22
**COBRA (1)**
54:11
**COBURN (2)**
65:18;91:3
**Code (7)**
49:11,13,14;50:20;
58:23;59:13,21
**coming (1)**
14:12
**communicate (1)**
21:7
**communication (2)**
27:22;28:13
**communications (2)**
52:7;70:22
**companies (1)**

14:18
**company (10)**
54:24;55:23;57:10;
58:19;59:7,11;74:10;
81:23;86:22;87:4
**comparable (7)**
72:13;74:2;75:11;
77:8,10,11,11
**compared (1)**
16:10
**compensation (6)**
29:10;31:16;33:6;
34:2,11;37:1
**complicated (1)**
24:4
**comply (2)**
49:12;59:2
**computer (1)**
41:13
**concern (1)**
21:21
**concerned (1)**
61:10
**concerning (1)**
51:9
**concluded (2)**
86:20;91:6
**conduct (2)**
57:19;58:24
**confirmations (1)**
18:5
**connection (2)**
34:10;66:13
**Connie (40)**
47:13;69:17;70:4,13,
18,24;71:1,12,17,21;
72:18;73:18;74:17;
75:7;76:6,12,16,18;
77:6,6,18,23;78:16,20,
25;79:6,8,14;80:22;
81:11,14,19;82:11,18;
83:1;84:6,7,7;90:17,23
**Connie's (2)**
70:6;71:16
**considered (1)**
43:24
**contact (2)**
19:7;31:23
**continually (2)**
56:10,12
**continue (4)**
26:11;37:24;54:12;
56:8
**continued (1)**
32:16
**continuously (1)**
55:24
**contributed (2)**
45:21,22
**contribution (2)**
46:9;47:7
**contributions (1)**
46:22

**convenient (1)**
35:1
**conversation (22)**
6:14;69:23;70:5,10;
71:12,20;74:24;75:1;
77:2,21;79:16;80:21;
81:10,13;82:18,25;
83:2,5,8;85:17,19;
90:18
**conversations (2)**
69:17;82:20
**coordinator (5)**
40:9;44:25;45:8;
47:11;65:25
**coordinator's (2)**
40:4;48:1
**co-pays (2)**
55:18,22
**copies (1)**
16:6
**copy (4)**
49:5;50:19;62:9,9
**corporate (3)**
40:11;83:24,25
**corporately (1)**
40:19
**correctly (1)**
67:14
**cost (9)**
55:9,9,18,18;56:21,
24;57:1;86:21;87:4
**Costco (5)**
22:9,10,16;23:6;
28:20
**couple (3)**
19:22;52:15;61:12
**course (3)**
50:3;53:21;77:20
**court (2)**
5:21;6:9
**cover (1)**
29:20
**coverage (2)**
56:14,16
**covered (2)**
56:10,12
**Cowan (1)**
71:4
**Crawford (1)**
69:18
**Credit (4)**
18:16;19:2;29:23,25
**crew (3)**
39:4,6,19
**CRIST (29)**
5:11,12;16:3;35:19;
36:14,21;42:23;43:1,6;
48:12,15;49:21;57:5,8;
62:12,15;65:20,23;
67:2,6;75:16;79:25;
80:3;87:15,18;90:10,
13,25;91:2
**current (4)**

14:25;15:1;37:5;
74:12
**currently (2)**
36:9,11
**customer (4)**
12:6;39:24;85:13,14
**customers (5)**
10:24;25:3;39:24;
64:1,12
**cutthroat (1)**
13:15
**CVS (1)**
23:8

## D

**daily (1)**
40:10
**damaged (1)**
63:21
**date (3)**
16:18;17:21;56:13
**dated (1)**
16:17;48:21;81:1
**day (7)**
16:22;41:7;44:22;
61:10;71:12;81:1;
86:15
**days (8)**
20:6;39:2;44:19;
52:15;53:6,17,23,23
**December (12)**
15:8;9;32:19;33:1,9;
34:24;51:7,11,12,15;
54:15;80:8
**decision (6)**
82:5,6;84:11;85:5,
10,15
**default (1)**
63:6
**definitely (1)**
91:4
**deli (4)**
32:7,10,13,14
**delivered (2)**
67:21;68:18
**delivery (1)**
79:12
**department (13)**
20:20,25;21:10;24:3,
5;25:2;40:24,24;41:6,
7;42:10;60:7;70:11
**departure (1)**
21:24
**deposition (4)**
5:15,22;7:1;91:6
**Depot (8)**
11:5;18:5;19:12;
21:20;27:5;29:4;31:6;
33:21
**depth (1)**
54:3
**described (1)**

49:13
**designated (1)**
42:11
**designations (1)**
63:14
**detail (2)**
10:13;40:14
**details (1)**
69:19
**determine (2)**
47:21;55:21
**determined (1)**
86:21
**difference (24)**
30:1;55:13,14,17;
73:17,21,24;74:18,22,
23;76:13;79:1,9;81:17;
82:4,8;84:14,16,25;
85:3,7,9;87:3;89:6
**different (6)**
7:5;14:17;20:9;
24:25;66:14;73:16
**difficult (2)**
24:4;38:3
**Dillard's (4)**
9:5,7;13:1,8
**direct (3)**
47:16,22;59:10
**directed (1)**
52:9
**directors (1)**
59:8
**disagreed (1)**
61:17
**disapproved (1)**
78:21
**discharge (1)**
58:1
**disciplinary (1)**
60:19
**disciplined (1)**
59:25
**discontinued (1)**
63:21
**discount (6)**
62:4,6;63:1,10;
64:24;67:17
**discover (1)**
53:20
**discovery (2)**
16:5;35:22
**discuss (1)**
21:23
**dishonest (3)**
58:7,9,12
**dishonesty (1)**
58:4
**distribute (1)**
41:2
**distributed (1)**
39:7
**Distributing (1)**
37:15

**document (3)**
16:18;48:17;52:20
**documents (3)**
16:7,24;49:17
**dollar (2)**
76:13;79:1
**done (7)**
13:24;14:20,21;26:6;
60:22;71:8;90:11
**dot-com (1)**
31:6
**double (1)**
55:5
**down (20)**
5:21;6:10;17:4,5;
32:20;33:3,23;45:10;
48:21;49:3,3,10;58:18;
59:6;63:24;71:4;81:12;
82:19,24;84:13
**download (1)**
40:19
**Dress (1)**
10:10
**drive (2)**
35:6;39:9
**driver (1)**
29:17
**dropped (3)**
32:20;40:11;41:12
**dryer (47)**
51:9;66:8,10,18,24;
67:11,16,20;68:4,10,
13,24;69:6,6;70:2,21,
23;71:22,22,25;72:2,4,
13,19,23,23,25;73:11,
19;74:1;75:11;76:3,4,
5,11;77:4,8,15;78:2;
79:3;81:11,15;82:17;
88:25;89:10;90:14,16
**dryers (6)**
66:13,15,18,23;
75:23;84:20
**due (2)**
76:13;79:1
**duly (1)**
5:6
**During (10)**
12:19;14:24;15:13;
29:6,18;34:1;35:3;
53:10;62:21;87:9
**Dustin (10)**
47:14;80:15;83:9,12,
19;85:17,20;86:2,7,13
**Dustin's (1)**
86:9

**E**

**earlier (1)**
62:21
**early (1)**
10:15
**earned (1)**

43:15
**east (1)**
65:10
**ECP (1)**
63:13
**education (1)**
8:9
**efficient (1)**
59:9
**efforts (1)**
16:8
**eight (4)**
39:20;43:1;44:21;
71:15
**either (5)**
42:1;58:15;66:17;
68:21;74:9
**else (14)**
24:12;39:13;51:21;
53:24;62:8;68:2;70:20;
81:5;82:12;83:4,11;
85:16;87:11;89:18
**elsewhere (1)**
20:24
**email (11)**
16:22;22:10,16,23;
23:10,14;24:11;26:2;
27:12,19;28:4
**emailing (2)**
23:4,5
**emails (2)**
18:4;25:15
**employed (7)**
12:20;29:12;50:8,17;
53:10,14,17
**employee (17)**
46:14;49:23,24;
50:16;51:15;52:3,5,19;
54:8;58:14;61:19,23;
62:5,10,17;63:6;88:4
**employees (5)**
53:1;59:8;63:5;
64:10;90:4
**employer (2)**
14:25;15:1
**employment (2)**
29:24;90:7
**end (3)**
14:12;73:23;77:20
**ended (5)**
14:9,10;66:12;79:7,
17
**enough (1)**
73:11
**ensure (2)**
59:9;66:5
**entire (1)**
10:2
**Eric (1)**
38:21
**established (1)**
64:1
**Ethics (7)**

49:11,13,14;50:20;
58:24;59:14,22
**Even (4)**
74:22,23,25;79:7
**events (1)**
66:23
**everybody (2)**
24:7,24
**evidence (1)**
16:12
**exact (1)**
71:25
**Exactly (1)**
25:8
**EXAMINATION (1)**
5:9
**examined (1)**
5:7
**example (3)**
28:19;42:14;66:8
**exchange (12)**
68:11;69:14;71:23;
72:1,2,9;73:13,14,15;
74:3,21;79:21
**exchanged (1)**
84:20
**exchanges (1)**
81:25
**exchanging (2)**
70:2;73:4
**Excuse (2)**
38:8;46:2
**Exhibit (51)**
15:24;16:1,6,6,10,11,
11;23:24;27:7;28:11;
35:16,17,21;36:15,17,
19,24;37:4,14,17;
42:24;43:2,4,10;44:4,
12;48:13,17;49:19,23;
50:4,5,7;51:1,6,19;
57:9,17;62:13,17;67:4,
8;75:14,18;80:1,4,18;
83:7;87:16,20,21
**Exhibits (2)**
36:23;43:8
**expectation (1)**
84:24
**expense (2)**
35:5;54:13
**expensive (2)**
81:15;82:3
**experience (2)**
11:24,25
**extent (1)**
23:6

**F**

**fact (2)**
66:4;71:5
**fall (2)**
6:13;42:14
**Family (4)**

11:3;29:20;55:10;
56:24
**farm (1)**
10:1
**father (2)**
8:16,16
**felt (2)**
20:13;85:6
**few (5)**
28:18;29:23;40:2;
53:17;69:16
**file (1)**
20:5
**filed (1)**
5:14
**fill (3)**
14:22;80:19;82:15
**filled (1)**
21:2
**finally (1)**
20:8
**financially (1)**
35:8
**find (13)**
14:8;16:9;31:3;38:5;
41:5,8;56:19,21;72:13;
73:14;75:10;77:8,15
**finding (2)**
37:23;76:11
**finish (1)**
53:9
**fired (1)**
58:15
**first (38)**
5:6;9:1,15;13:25;
20:24;30:8,10;31:25;
32:25;38:13;48:25;
50:8,21,24;58:3;60:7;
63:4;65:8,11,16;66:1,9,
24;67:11;68:8;69:6,13,
20,21;70:1;71:11,14;
83:22,23;87:21;88:24;
90:14,16
**five (5)**
40:8;44:18,25;45:2;
53:23
**flip (1)**
49:24
**floor (3)**
9:8;12:7;32:10
**follow (8)**
6:4;25:19;26:5;
59:16,18,21;62:25;
85:15
**following (1)**
5:1
**follows (1)**
5:7
**followup (3)**
17:25;19:4;24:14
**forklift (1)**
39:12
**formal (1)**

8:9
**former (1)**
54:8
**forth (1)**
49:14
**found (6)**
14:10;30:12,15;
66:19;71:5;78:2
**Four (5)**
19:25;20:2,3;40:8;
53:23
**Francisco (1)**
7:10
**free (1)**
89:19
**freight (9)**
20:11;26:13;28:19;
31:6;32:11;39:4,6,7,18
**Frenchtown (2)**
8:20;35:6
**friend (1)**
57:14
**front (3)**
36:22;42:7;71:8
**full-time (9)**
12:11;34:21,25;35:2;
38:2,5;43:24;44:1,9
**fully (1)**
12:19
**functionality (1)**
77:12
**further (6)**
19:4;22:7;27:15,22;
28:6,13

## G

**G&S (1)**
37:15
**garbled (1)**
65:22
**gas (2)**
35:5;42:14
**gave (3)**
16:24;17:4;79:23
**GED (2)**
8:6;9:15
**generate (1)**
40:16
**given (3)**
52:18;53:3;89:19
**gives (4)**
11:24;54:2,5,9
**giving (1)**
21:17
**goals (1)**
13:12
**goes (1)**
82:18
**Good (4)**
8:2;11:24,25;12:3
**gossiping (1)**
60:18

**graduate (1)**
8:5
**grill (1)**
64:7
**grills (1)**
42:15
**Grocery (12)**
15:2;29:4;32:5,6;
33:16,25;34:9,14;
35:15;36:5;37:15,25
**guess (5)**
29:6,6;55:6;71:15;
83:18
**guide (5)**
49:6,14,23;50:16;
51:15
**gun (1)**
41:16

## H

**half (2)**
29:8;40:8
**halfway (3)**
49:3;58:18;59:6
**hand (1)**
40:22
**handbook (2)**
52:3,5
**handed (6)**
48:16;49:22;62:16;
67:7;75:17;87:19
**handing (1)**
80:4
**hands (1)**
85:11
**handwriting (2)**
75:25;80:10
**handwritten (2)**
17:16;83:25
**happen (1)**
64:15
**happened (11)**
39:3,21;40:3;50:12;
51:2;71:20;80:13;81:8,
9;86:18;87:6
**happens (3)**
5:20;25:18;64:13
**Harbor (3)**
26:12;28:19;31:6
**hard (3)**
6:9;47:21;55:21
**head (1)**
24:25
**headings (1)**
24:25
**health (6)**
45:18;46:2,21;54:12,
16;61:10
**hear (9)**
6:19;22:17;23:20;
24:12;27:1;77:20,23,
25;79:5

**heard (3)**
25:12;26:17;89:18
**hearing (1)**
87:7
**heat (2)**
67:25;68:3
**help (1)**
25:7
**helped (2)**
10:24;39:24
**herein (1)**
5:6
**Here's (2)**
56:19;79:13
**hey (1)**
82:7
**high (3)**
8:3,4;84:21
**hire (3)**
13:9;21:12;34:19
**hired (5)**
5:13;32:12;34:19;
49:1;50:21
**hiring (2)**
30:18;38:18
**history (1)**
12:2
**holiday (1)**
32:18
**Home (8)**
18:4;19:12;21:20;
27:5;29:4;31:5;33:21;
68:17
**Honestly (2)**
17:3;88:16
**horse (1)**
86:25
**HOSKIN (13)**
5:5,12;7:16;16:4;
35:20;36:22;43:7;
48:16;57:9;62:16;67:7;
75:17;87:19
**hour (8)**
13:10;36:2,10;37:11,
22;43:21;56:6;57:6
**hourly (1)**
13:13
**hours (14)**
32:14,15,16,19;33:2,
11;34:17;37:8;43:17,
23;44:21;56:6,7,9
**house (3)**
35:5;67:21;69:5
**huh-uh (1)**
6:12
**hung (1)**
78:6
**husband (5)**
29:12;45:25;47:1;
54:20,20
**husband's (5)**
7:15;55:11,15,25;
56:5

## I

**identification (16)**
15:25;16:2;35:18;
36:16,18,20;42:25;
43:3,5;48:14;49:20;
62:14;67:5;75:15;80:2;
87:17
**identified (1)**
89:10
**identifies (1)**
88:25
**identifying (1)**
41:20
**II (1)**
49:4
**ill (1)**
8:17
**imagine (1)**
5:18
**immediate (1)**
57:25
**impact (1)**
59:10
**important (2)**
6:4,5;68:4
**impression (2)**
21:11,13
**income (1)**
29:9
**incorrectly (1)**
60:15
**indicate (3)**
18:3;21:20;36:1
**indicated (1)**
57:10
**indicates (1)**
43:14
**indicating (1)**
42:1
**indication (2)**
25:9;27:6
**information (13)**
17:4,19;31:2;41:3;
48:2;51:25;52:2;54:1,
2,4,4,11;75:13
**initialed (2)**
49:8,15
**initialling (1)**
48:25
**initially (2)**
30:13;32:12
**in-person (1)**
25:21
**input (2)**
31:22;60:15
**inquire (1)**
22:7
**installed (1)**
9:18
**Instances (1)**
57:22

**instead (1)**
6:12
**insurance (19)**
45:19,24;46:21,24;
47:1,8;54:13,16,19;
55:8,11,15,23,25;56:5,
8,11,22,25
**insured (1)**
54:21,24;55:5,10,24
**intention (1)**
38:4
**interest (1)**
25:23
**interested (3)**
72:22;73:2,7
**interrupted (1)**
83:19
**interview (9)**
19:19;20:9,22;21:9;
23:17;25:21,25;26:20;
27:3
**interviewed (5)**
20:16,18,21;23:2;
29:1
**interviews (6)**
15:21;17:25;18:6;
19:21;20:3;28:23
**into (13)**
6:13;10:15;11:25;
25:22;30:3,6;46:13;
51:18;69:19,22,25;
86:19;90:5
**intranet (1)**
52:25;53:11;57:11
**Inventory (4)**
72:12;74:1,6;84:9
**investigation (1)**
86:20
**involved (1)**
83:8
**is's (1)**
70:16
**issue (2)**
60:17;75:22
**issues (5)**
51:8;60:3,13;61:11;
90:7
**item (19)**
41:8,25;42:3;62:2;
63:4;64:23;72:1;73:14,
16;74:4,16,18,19,21;
82:1,3;84:8;85:6;88:24
**items (12)**
40:17;41:2,20;42:3,
12,13;58:3;63:12,23;
64:11;65:24;66:6

## J

**January (1)**
50:1
**Jason (1)**
7:21

**JCPenneys (1)**
10:11
**job (51)**
9:1,15;10:23;11:21;
12:12;14:8,10,13;16:9,
16;17:11,12;19:8;21:5,
8,17;22:25;24:1,23;
26:9,12;27:9;29:2;
30:3,4,12,16,21;31:8,9,
13,18,19;33:15,20;
34:13,18;35:4,7;37:6;
38:1,2,13,16;39:23;
40:6;42:20;47:25;
57:19;66:4;75:5
**jobs (13)**
11:19;16:20;20:13,
16;28:24;31:2,17;
33:15,24;34:7,10,23;
35:2
**John (1)**
5:12
**July (5)**
15:6;32:2,3,17;34:24
**jury (1)**
7:6

**K**

**keep (4)**
17:11;20:5;31:16;
38:4
**kept (1)**
17:17
**kids (1)**
7:17
**kind (11)**
13:22;16:10,14;
40:12;47:21;62:18;
69:20;72:23;77:12;
81:9;83:18
**knew (8)**
64:25;65:6;73:22;
81:22;84:19,24;89:10,
14
**Knife (4)**
29:15,16;55:1,15
**knowledge (1)**
73:13
**Kohl's (2)**
25:24;33:19

**L**

**label (4)**
41:15,17,18;42:1
**Labels (2)**
40:19,25
**Larry (1)**
47:13
**last (7)**
6:20,25;56:14;78:24,
24;88:19;89:22
**late (1)**

**11:16**
**later (8)**
21:4;22:19;53:20;
64:19;66:20;79:11;
82:2;85:19
**lawyer (3)**
5:19;52:7,8
**lead (1)**
24:1
**learn (1)**
39:9
**learned (1)**
39:11
**learning (1)**
60:8
**least (6)**
5:18;27:12;31:12;
53:5,17;56:9
**leave (5)**
11:21;12:3;13:7,18;
72:16
**Lee (1)**
38:21
**left (12)**
12:9,9;13:20,24;
52:18;55:25;61:9;
76:10,18;79:16;81:13;
85:11
**legitimate (1)**
59:12
**Less (3)**
10:10;13:4,6
**letter (1)**
54:10
**letting (1)**
26:1
**LG (4)**
77:16;78:3;88:25;
89:10
**life (2)**
47:1,8
**line (1)**
62:8
**list (19)**
18:12;22:9;24:19;
26:11;28:1;17;45:5;
72:12,12;74:1,2,6,8,15;
75:10,10;77:7;83:3;
84:9
**listed (3)**
17:1;19:22;20:4
**lists (1)**
24:24
**little (21)**
6:1,15,24;9:12;
10:13;11:15;13:23;
16:15;18:13;26:1;27:5;
28:16;33:13;38:3,9;
40:14;44:15;54:25;
61:5;66:22;67:15
**live (6)**
7:22,23;8:19,20;
29:22;46:24

**lived (1)**
8:21
**LMP (2)**
63:13,18
**Local (1)**
10:20
**locally (1)**
30:4
**locate (4)**
18:10;31:1;41:9;
42:2
**located (1)**
9:20
**log (5)**
17:12,16;18:14;54:7,
7
**long (12)**
11:7,14;12:8,16;
26:8,8;39:1,18;40:1,6;
68:16;85:22
**longer (1)**
74:12
**look (13)**
18:25;23:23;28:3,17;
37:4;44:4;48:19;57:16;
62:19;72:11;73:25;
87:23;88:19
**looked (2)**
78:12;86:25
**looking (7)**
12:23;22:25;38:4;
43:13;53:24;57:9;
90:15
**looks (8)**
13:4;23:8,11;28:18;
31:12;35:23;67:15;
80:7
**loss (2)**
86:22;87:5
**lot (2)**
31:4;69:16
**low (1)**
35:5
**lower (1)**
42:2
**Lowe's (65)**
5:13;8:24;13:24;
15:7,18;21:18,25;29:3;
30:15,17,20;32:1;
38:10,11,22;42:5;
43:10,24;44:5,13,19;
45:16;46:6,22,25;47:2,
3,7;48:5,7;49:1,5,11,
12,13;50:8,19;51:18;
52:16;53:1,10;54:18;
55:4,16;56:1,22;57:14;
58:7,8,11,23;59:9,11;
60:1,21;61:19;62:17,
22;67:12;88:20;89:20,
23;90:1,3,6
**lowest (2)**
63:12,18

**M**

**making (3)**
36:1,9,11
**mall (1)**
13:2
**management (2)**
57:18;90:1
**manager (8)**
20:20,22,25;21:10;
41:6;47:15;80:15;83:9
**managers (1)**
48:10
**manner (4)**
55:17;85:8,12;87:3
**many (5)**
31:16;32:14;38:3;
43:17,23
**March (1)**
91:7
**mark (7)**
15:23;35:16;36:14;
42:23;48:12;62:12;
67:2;79:25;87:15
**markdown (2)**
83:24,25;84:10,21
**marked (31)**
15:24;16:1,11;22:13;
35:17,21;36:15,17,19;
42:24;43:2,4,8;48:13,
17;49:19,22;58:22;
59:5;62:13,17;67:4,8;
75:14,18;80:1,4;84:13;
87:16,20;88:20
**Market (1)**
63:18
**married (1)**
7:13
**match (1)**
46:11
**matched (1)**
46:13
**matching (1)**
46:12
**materials (2)**
50:20;52:16
**math (1)**
67:15
**matter (1)**
52:8
**Max (1)**
11:4
**may (2)**
25:16;59:11
**Maybe (4)**
17:15;28:16;35:15;
68:22
**MDU (1)**
55:1
**mean (7)**
12:23;31:8;40:14;
53:7;62:3;63:9;64:25

**means (2)**
40:13;64:5
**meant (2)**
63:15,17
**meet (2)**
13:12,13
**meeting (7)**
86:2,8,18;87:9,12,
22;89:22
**merchandise (3)**
24:7;58:11;63:5
**merchandised (1)**
42:13
**merchandising (4)**
20:12,20,21;21:10
**method (1)**
17:22
**Michael (1)**
7:20
**might (9)**
18:4;20:23;21:1;
32:4;82:9;85:25,25;
90:11,24
**miles (2)**
9:24;35:4
**mind (1)**
72:4
**minimum (1)**
56:7
**minus (1)**
11:16
**minute (2)**
48:19;62:18
**minutes (1)**
79:11
**Misconduct (1)**
57:22
**miss (1)**
60:17
**missed (2)**
25:17;56:13
**Missoula (3)**
18:17;35:7,12
**mistake (1)**
60:9
**model (1)**
74:13
**models (1)**
74:11
**money (5)**
35:6;55:10;56:21,24;
57:2
**Montana (7)**
7:11;8:14,22;9:2,13;
12:17;36:25
**month (8)**
12:24;13:11;15:11,
13;56:8,8,13,15
**months (3)**
29:8;35:3;39:20
**more (7)**
10:13;23:20;34:17;
35:5;40:14;44:15;52:2;

55:10,18,19,22;56:4,
24;60:18;61:5;73:20;
81:15;82:3;83:16
**morning (4)**
40:15;45:2;65:7;
71:14
**most (2)**
6:5;37:5
**mostly (1)**
32:10
**move (2)**
7:11;11:23
**moved (8)**
8:15,17,18;10:11;
12:16;13:17;30:10;
39:4
**MSP (1)**
63:13
**much (8)**
10:25;24:25;45:5;
72:6,9,18,20;84:14
**must (2)**
63:6,25
**myself (2)**
42:6;46:24
**mysterious (1)**
56:20

## N

**name (3)**
5:12;7:15;38:20
**Names (1)**
7:19
**near (2)**
43:14;76:23
**necessary (1)**
66:5
**need (5)**
6:1,11;37:21;38:2;
41:8
**needed (7)**
40:17;42:3;47:15;
48:3,7;71:23;78:11
**new (10)**
28:18;41:17;42:2;
49:24;50:16;51:14;
52:4,19;65:10;68:24
**next (8)**
19:12;22:9;24:17;
26:22;27:25;49:25;
70:8,17
**Nobody (1)**
87:2
**nonetheless (1)**
87:4
**Nonproductive (4)**
72:12;74:1,6;84:9
**nonstock (2)**
40:22;76:7
**noon (1)**
86:16
**Nope (2)**

35:13;87:14
**normal (4)**
6:13;46:17;62:3;
84:10
**normally (2)**
57:25;84:13
**north (1)**
9:24
**notes (1)**
18:2
**notice (1)**
54:12
**noticed (1)**
55:13
**notified (1)**
26:2
**November (8)**
32:18;68:13,23;69:4,
5,8;75:20;80:24
**NPI (8)**
72:11;74:5,15;75:10;
76:8;77:7;84:6,9
**number (6)**
17:22;31:23;49:10;
63:11,20;72:1
**numbers (1)**
54:9
**numeral (1)**
49:4

## O

**oath (3)**
7:2,3,5
**obligated (2)**
59:1;85:6
**obviously (1)**
61:17
**occasion (1)**
15:17
**occur (2)**
70:5,10
**occurred (1)**
85:23
**occurring (1)**
87:11
**o'clock (1)**
45:14
**October (2)**
8:25;66:25
**off (16)**
51:19,21;52:2,20,22;
57:7,10;62:6;63:12,25;
64:6,9,21;67:17;68:7;
90:12
**offer (2)**
21:4;85:6
**offhand (1)**
20:19
**office (13)**
10:8,17,19;11:4,4;
12:6;70:6;71:16;72:16;
76:16;86:9,19;90:18

**officers (1)**
59:8
**old (6)**
7:19;14:22;38:7;
41:17;52:3;68:25
**once (3)**
46:14;65:5;69:22
**one (44)**
6:6,19,25;14:22;
20:11,12,19,24;22:9;
25:17;30:23;31:18;
33:22;36:23;43:9;
45:18;47:12;56:13,14,
23;60:12;61:9;63:11;
66:13,14;68:25;69:1,7,
13;70:3,23,24,24;
72:13;74:2;77:10,25;
79:3;81:15;83:16;
85:18;86:6;89:3,4
**ones (1)**
47:12
**online (22)**
14:17,20,21,23;
15:15;17:23;18:19;
19:15;22:21;24:8;
25:10,24;26:6,7,15,24;
27:17;28:1,8,21;30:22;
48:4
**only (10)**
6:17;29:1;34:19;
52:20;59:11;60:12;
73:11;77:10,13;78:11
**onto (1)**
53:19
**open (1)**
45:13
**operated (1)**
11:3
**opposed (1)**
55:16
**order (7)**
6:3;16:25;17:1;
31:15;39:25;60:15;
63:23
**organized (1)**
42:16
**orientation (6)**
49:5,13,24;50:16;
51:15;52:19
**Others (3)**
31:5;33:22;41:3
**ought (1)**
58:15
**out (37)**
7:6;8:20;9:10,13;
14:9,22;19:10;24:7;
25:16;31:3;38:3;39:4;
40:20,21;46:7;47:1,4,
6;51:5,14;54:3;56:4,
19,21;65:15,21;66:19;
69:3,4,11;71:5;74:11;
75:10,23;80:19;82:15;
90:15

**over (16)**
5:23;6:6;8:15;11:15;
13:2;35:10,12;41:17;
59:4;75:10;76:18,23;
77:7,9;84:17;89:19
**override (1)**
88:22
**own (6)**
7:25;9:16;47:4;52:9,
10;54:13
**owned (2)**
9:16;11:3;55:1

## P

**page (9)**
16:9;22:13;49:25;
57:16;58:21,23;59:4;
63:3;88:19
**pages (2)**
87:21;88:18
**paid (4)**
12:8,21;73:12;
74:22
**Pamphlet (1)**
49:15
**paper (1)**
14:22
**Pardon (1)**
59:17
**parents (1)**
8:15
**Park (2)**
18:16;19:2
**part (8)**
34:4;39:5;45:21,22;
59:13;68:4;74:25;83:2
**particular (2)**
63:4;85:18
**part-time (5)**
11:19;12:10;34:18,
19;35:7
**passed (1)**
8:17
**password (5)**
53:3,8,14,16,20
**pay (17)**
35:15,21;37:5;47:4;
56:4;73:16,21;74:18;
79:9;81:16;82:4,8;
84:25;85:2,7,9;87:2
**paycheck (2)**
47:6;52:23
**paying (3)**
73:23;74:23;89:15
**Penneys (1)**
12:12
**people (8)**
9:10;21:15;24:3;
25:4;47:22;61:12;
64:16;65:11
**per (2)**
30:23;36:10

**percent (8)**
35:11;62:6;63:10,12,
25;64:6,9;67:17
**percentage (3)**
46:7,15,19
**performance (2)**
57:18,19
**period (11)**
9:5;13:11;14:24;
15:11,13;29:7,19;34:1,
8;35:23;37:9
**perk (1)**
62:4
**person (17)**
11:23;15:19;29:1;
43:23;48:7;62:3;65:8,
16;66:1,9;70:1,8,17,24,
24;83:16;90:16
**Phil (30)**
69:18;70:9,12,14,25;
71:1;72:14;75:3,5,6,8,
9;76:6,12,19;77:2,4,17;
78:15,25;79:2,10,14,
20;82:9,21;83:1;88:25;
89:9;90:22
**Phillips (1)**
41:11
**Phil's (1)**
77:20
**phone (9)**
17:22;20:8;54:9;
70:12,16;71:1;78:6;
79:2,7
**photo (2)**
23:12,13
**physically (7)**
41:1,4;69:4,10;
70:25;71:6;87:24
**picker (1)**
39:12
**place (3)**
19:12;64:17;79:4
**placed (5)**
16:4;35:20;66:2,6,18
**Placer (1)**
8:4
**places (3)**
25:22;28:18;64:16
**plan (2)**
37:24;46:3
**plans (1)**
37:23
**please (10)**
35:16;37:21;42:23;
43:1;48:12;62:12;67:3;
79:25;82:19;87:15
**plugged (1)**
67:23
**plus (1)**
11:16
**pocket (2)**
47:5;56:4
**point (5)**

37:21;54:10;78:9;
79:5;85:13
**policies (1)**
50:14
**policy (5)**
61:20;62:1,10,18,25
**position (9)**
20:21,23;21:2;23:11;
24:1,22;26:2;32:7;40:5
**positions (5)**
20:4,7,9,10;24:24
**possession (1)**
58:19
**possible (1)**
17:7
**postcard (1)**
26:1
**postings (1)**
31:5
**prepare (1)**
75:19
**prepared (2)**
80:5,7
**prescriptions (1)**
55:18
**present (3)**
70:25;71:6;88:1
**pretty (3)**
24:25;45:5;68:4
**price (22)**
40:11;41:11,14,16,
23;42:2,4;63:14,18,25;
64:6;67:16;73:9,12;
76:5;77:11;78:3;85:5,
10;87:2;89:6,10
**prices (4)**
40:18,24;63:6;66:6
**pricing (9)**
40:4,9;42:18,19;
44:25;45:8;47:11;48:1;
65:25
**print (7)**
40:15;41:25;51:8,14,
21;54:3;75:10
**printed (7)**
25:16;40:20;51:4,6,
19;52:20,22
**printout (1)**
41:13
**Prior (2)**
45:10;59:24
**probably (8)**
22:24;37:5,22;46:20;
50:13,18;52:22;58:23
**procedures (1)**
50:14
**proceeded (1)**
40:23
**proceedings (1)**
5:1
**process (2)**
85:4,11
**processed (4)**

63:6;85:8,12;87:3
**produce (1)**
18:9
**produced (2)**
16:7;49:17
**product (1)**
40:23
**productive (1)**
74:9
**profitability (1)**
59:11
**program (1)**
47:8
**programs (1)**
8:11
**prompt (1)**
6:14
**proof (1)**
31:21
**proper (1)**
59:7
**properly (1)**
25:3
**property (2)**
58:19;81:23
**prospects (1)**
34:16
**protect (1)**
59:8
**protection (2)**
59:5,6
**provide (2)**
31:20;46:22
**provided (5)**
35:22;46:25;55:14
**pull (5)**
7:5;41:17;76:6;77:7;
84:8
**pulled (3)**
40:10;57:10;77:9
**pump (1)**
10:14
**pumps (1)**
9:18
**purchase (7)**
51:9;61:19;62:2,6,7,
10;78:21
**purchased (5)**
63:5;67:11;71:22;
77:5;81:16
**Purchases (2)**
62:18,25
**purpose (2)**
14:11;64:20
**purposes (18)**
15:25;16:2;35:18;
36:16,18,20;42:25;
43:3,5;48:14;49:20;
59:12;62:14;64:18;
67:5;75:15;80:2;87:17
**put (11)**
11:16;14:18;24:7;
36:22;39:8;41:17;43:7;

46:13;64:16;65:3;
66:12
**puts (1)**
10:14

**Q**

**qualifications (1)**
20:14
**qualified (2)**
20:4;35:2
**quite (1)**
40:2

**R**

**raised (1)**
7:9
**ran (1)**
10:6
**reach (1)**
19:10
**reactivate (1)**
30:24
**read (4)**
50:23;88:2;91:2,3
**reading (2)**
67:14;88:10
**really (6)**
10:23;12:24;24:4;
40:13;41:10;46:12
**reapplied (3)**
20:7;28:19;32:22
**reapply (1)**
20:7
**reason (1)**
65:2
**rebuy (1)**
63:21
**recall (9)**
25:14;43:18;48:24;
51:22;72:8,20;87:11,
20;88:16
**receipt (4)**
67:9;79:11,13,23
**received (6)**
14:6;37:17,18;49:5;
50:4,21
**receiving (3)**
12:15;20:11;21:1
**recent (1)**
37:5
**recently (1)**
25:24
**recognize (3)**
43:10;67:8;75:18
**record (5)**
17:19,24;57:7;65:22;
90:12
**records (2)**
46:20;68:12
**redirects (2)**
54:1,8

**reduce (1)**
13:13
**reduced (2)**
5:23;42:1
**reference (1)**
16:20
**referred (1)**
74:5
**refers (1)**
57:21
**reflect (2)**
46:21;68:12
**refuse (1)**
88:8
**refused (1)**
88:4
**register (1)**
62:8
**registered (1)**
30:11
**regular (3)**
42:12;85:13,14
**REI (1)**
27:6,7
**relating (1)**
90:7
**relocation (1)**
63:24
**remained (1)**
53:16
**remember (23)**
8:6;14:2;20:18;
25:12;26:17;32:3;
33:22;50:15,19;52:11;
63:19;70:1;78:1;81:4,
5;82:10,11;83:4,14;
85:16;86:15;87:24;
90:24
**repeated (1)**
6:21
**replace (1)**
54:18
**replacement (2)**
73:20;81:14
**report (10)**
40:10,16,16,21;
41:24;47:10;76:7,8;
88:21,22
**reported (2)**
47:12,14
**reporter (2)**
5:21;6:9
**represent (1)**
5:13
**requests (3)**
16:5,8;35:23
**required (4)**
14:14;33:20;56:9;
91:9
**requirement (2)**
31:15;34:5
**requirements (2)**
30:24;34:11

**reregister (1)**
30:23
**residential (2)**
9:25;10:1
**Resource (1)**
49:23
**respect (4)**
41:22;66:17,23;
70:23
**responded (2)**
19:17;24:10
**response (16)**
16:7;18:23;19:1,3,
13;22:10;23:10,24;
27:7,13,20;28:3,10;
31:24;35:22;86:24
**responses (3)**
16:5,21,22
**responsible (3)**
35:8,9;42:15
**rest (1)**
28:17
**result (2)**
33:2;57:25
**retail (3)**
9:9;11:2;64:1
**retired (1)**
8:16
**retirement (1)**
46:3
**return (1)**
63:22
**returned (1)**
63:22
**returning (4)**
72:14;74:3;75:11;
77:9
**REV (1)**
63:5
**reverse (1)**
13:23
**review (1)**
5:24
**revised (1)**
50:14
**rewrite (1)**
5:25
**Right (27)**
11:17;13:2,3,20;
15:9;20:19;22:14;25:6,
8;54:22;61:13,24;
64:17;66:25;67:24;
68:7,14,15;69:9;71:7,
9;72:6;73:4;76:18;
81:20;85:23;88:18
**River (4)**
29:15,16;55:1,15
**Roman (1)**
49:4
**room (1)**
83:12
**Ross (5)**
12:8,9;24:17,19;

25:19
**Ross's (3)**
  10:10;11:17;12:5
**routine (1)**
  53:11
**rude (1)**
  6:15
**rules (1)**
  6:5
**rumors (6)**
  60:11,24;61:1,4,7,16
**run (2)**
  14:9;90:5

## S

**Sacramento (1)**
  9:24
**salary (1)**
  29:18
**sale (2)**
  72:6;73:10
**sales (1)**
  13:12
**same (15)**
  11:18;12:9;16:22;
  24:24;25:1;37:11;
  43:20;55:20;71:25;
  73:14;76:5,7;81:1,25;
  85:14
**Samsung (2)**
  72:25;73:2
**San (1)**
  7:10
**sat (2)**
  11:22;82:14
**save (1)**
  18:7
**saw (3)**
  16:12;19:21;41:12
**Saying (5)**
  25:7;41:7;54:12;
  82:11;88:12
**scan (1)**
  41:16
**schedule (3)**
  45:6,7,11
**school (3)**
  8:3,4;14:22
**screwdriver (1)**
  41:11
**search (5)**
  14:13,16;31:19;
  33:21;38:1
**Sears (3)**
  23:23,24;24:15
**season (1)**
  32:18
**seasonal (1)**
  63:22
**second (7)**
  63:3;66:14;68:13;
  69:6,7;80:5;84:4

**sections (1)**
  42:10
**security (1)**
  43:14
**seeing (1)**
  87:20
**seek (1)**
  34:5
**seemed (1)**
  83:2
**seems (1)**
  42:6
**self (1)**
  7:24
**sell (1)**
  63:24
**selling (1)**
  74:10
**sense (1)**
  35:12
**sent (3)**
  14:3;19:3;23:14
**sentence (1)**
  78:24
**sentences (1)**
  78:24
**sequence (2)**
  69:20,22
**serious (1)**
  57:25
**service (4)**
  12:6;30:4,21;39:24
**services (1)**
  31:8
**service's (1)**
  31:9
**set (3)**
  20:9;49:14;79:12
**setting (1)**
  18:5
**seven (5)**
  15:10,13;29:8;44:21;
  71:15
**seven-month (2)**
  29:7,19
**several (1)**
  15:21
**shift (1)**
  44:25
**shifts (1)**
  44:24
**Shipping (1)**
  12:15
**shoes (1)**
  24:5
**Shopko (2)**
  26:22;33:20
**short (2)**
  9:5;43:19
**shorten (1)**
  28:16
**show (2)**
  7:6;25:23

**showed (1)**
  16:8
**showing (2)**
  16:18;36:25
**shows (2)**
  37:8;89:6
**Side (4)**
  18:16;19:2;77:25;
  88:20
**sign (4)**
  88:5,6;91:2,3
**SIGNATURE (1)**
  91:9
**signed (4)**
  30:11;50:5;76:1;
  80:10
**significance (1)**
  84:2
**signing (1)**
  48:24
**similar (1)**
  22:23
**simple (1)**
  41:10
**sit (2)**
  33:5;56:3
**site (5)**
  48:2;52:25;53:11,19;
  54:2
**six (8)**
  11:8;12:18;15:10,13;
  29:8,18;39:20;45:14
**skills (1)**
  39:15
**small (3)**
  10:25;11:2;32:6
**smart (1)**
  52:4
**social (1)**
  43:14
**sold (3)**
  10:7,15;63:25
**somebody (3)**
  53:3;81:5;82:7
**someone (3)**
  35:3;61:3;86:8
**sometimes (1)**
  32:10
**son (2)**
  7:20,21
**Sorry (2)**
  8:19;14:19
**sort (6)**
  6:2;8:12;9:10;46:3;
  55:19;64:11
**SOS (2)**
  63:22,23
**sought (1)**
  34:2
**sound (2)**
  66:25;68:14
**sounds (2)**
  6:15;68:15

**source (1)**
  29:9
**special (3)**
  62:7;63:23,23
**specialist (3)**
  24:22;27:10;75:6
**Sportsman's (1)**
  27:25
**spreading (6)**
  60:10,24,25;61:3,6,
  16
**squirrel (1)**
  64:11
**squirrelled (1)**
  64:23
**standard (1)**
  46:19
**standards (1)**
  57:18
**standing (1)**
  70:13
**Staples (1)**
  28:8
**start (8)**
  6:25;8:24;15:5;
  54:22;71:19;77:1;81:8;
  86:17
**started (11)**
  15:19;29:3;31:25;
  32:23;33:25;34:20;
  35:14;38:11,15;67:23;
  83:19
**starting (2)**
  34:8;36:4
**state (2)**
  31:20;36:25
**stated (1)**
  60:21
**statement (6)**
  75:19;78:23;80:5,14;
  81:12;82:16
**stay (1)**
  11:7
**stealing (3)**
  58:6,8,11
**Stephanie (1)**
  47:19
**still (8)**
  6:20;17:14;32:8,9;
  37:11;38:22;50:10;
  51:3
**stock (7)**
  74:4,16,18,19,21;
  84:8;90:23
**stocked (1)**
  25:3
**stocking (1)**
  27:9
**stop (1)**
  38:24
**store (27)**
  10:8;17,19,25;11:2;
  13:15;20:22,24;25:5;

32:6;39:8;42:6,16;
  45:12,21;47:15;48:8,
  10;63:24;64:10;65:25;
  69:25;71:25;80:15;
  89:19,23;90:5
**straight (3)**
  73:15;79:3,8
**stub (4)**
  35:16,21;37:6;52:23
**stuff (8)**
  9:10;42:6;50:23;
  53:1;55:19;60:8;61:22;
  89:19
**submitted (1)**
  55:22
**Substantial (2)**
  12:23,25
**sufficient (2)**
  7:24;29:20
**supervisor (3)**
  47:17,22;48:9
**supply (3)**
  10:8,17,19
**sure (10)**
  17:15;24:6;25:2;
  38:25;45:12;47:18;
  57:13,15;62:11;65:18
**surrounding (1)**
  21:24
**suspect (1)**
  48:18
**swap (6)**
  76:13;78:25;79:3,8;
  89:14;90:15
**swapped (5)**
  69:3,4,10;89:3,13
**swapping (2)**
  70:23;75:23
**sworn (1)**
  5:7
**system (1)**
  40:20
**systems (1)**
  9:19

## T

**tag (1)**
  83:25
**talk (20)**
  6:6;13:23;15:22;
  16:15;18:12;19:8;
  33:13;34:8;38:9;48:7;
  52:6;66:22;70:18,20;
  71:11;75:2;76:19;
  80:23;83:1;86:7
**talked (14)**
  21:11;27:5;69:21;
  70:1,8,17;76:6;77:6;
  89:25;90:3,6,17,22,23
**talking (5)**
  31:3;57:17;70:2;
  73:18;77:18

**talks (1)**
63:20
**Target (3)**
27:17,20;28:20
**team (1)**
24:1
**tech (2)**
23:12,13
**teller (2)**
11:13,21
**telling (1)**
83:1
**ten (4)**
62:5;64:6,9;67:17
**term (1)**
64:22
**terminated (18)**
22:5;29:2;40:7;
42:21;51:16,19,24;
52:14,17,21;53:6;
54:23;55:9;59:24;
85:21;86:4,23;87:5
**termination (6)**
85:22;86:8;87:21;
89:22;90:4,8
**terms (2)**
12:3;69:21
**testified (1)**
5:7
**testimony (1)**
5:2
**Theft (1)**
59:10
**theirs (1)**
21:21
**therefore (1)**
86:23
**Thereupon (1)**
91:6
**thinking (1)**
6:20
**third (2)**
22:13;38:8
**though (4)**
7:1;48:6;65:5;68:5
**thought (6)**
20:23;25:15;35:9;
52:4;61:6;82:5
**three (10)**
19:20,21;44:2;45:6;
49:10;53:6;63:20;
80:16,17;83:20
**throughout (1)**
39:7
**thrown (1)**
50:13
**times (3)**
19:23,25;20:3
**Tina (10)**
47:13,20;80:20,23;
81:3;82:14;83:5;86:12,
13;87:9
**title (1)**

**10:23
today (6)**
7:1,3;18:10,14;33:5;
56:3
**told (20)**
21:16;22:3,5;30:18;
71:21;72:5,20;73:1,25;
74:20;75:2,2,7,9;77:4,
6;78:2,3;87:12;90:16
**took (4)**
8:6;46:7;79:4,20
**top (2)**
6:6;43:14
**to-wit (1)**
5:2
**town (1)**
32:6
**trading (2)**
72:23;73:2
**training (8)**
8:11;13:11;48:2;
60:3,4,9,13,17
**transcript (3)**
5:24;6:4;7:6
**trial (2)**
7:2,4
**trip (1)**
69:1
**truck (1)**
29:17
**truth (1)**
22:3
**try (3)**
18:11;53:19,22
**trying (2)**
56:19,21
**Tuesday (1)**
91:7
**turn (2)**
14:23;16:9
**twice (1)**
20:8
**two (20)**
8:17;20:7,9;33:10,
12,22;35:4,11;45:1,2;
46:8;63:19;66:13,14,
23;76:21;78:24;84:20;
87:21;88:18
**two-week (1)**
37:9
**type (2)**
58:4;60:19
**typically (5)**
14:15;43:17;44:21,
24;54:11

**U**

**unacceptable (1)**
86:22
**unauthorized (1)**
58:18
**under (11)**

**7:2,3,5;24:3;43:13;
49:4,10;55:15,25;
56:10;59:6
understood (6)**
59:1,16,18,20;71:3;
73:19
**unemployment (12)**
14:6,14;29:10;30:23;
31:16;32:22;33:6,8;
34:2,11;35:10;37:1
**Union (3)**
18:16;19:2;56:17
**unless (1)**
81:25
**unusual (1)**
84:21
**up (32)**
8:15,17,18;10:11;
12:16;14:12;17:10;
18:5;20:9;25:19;26:5;
28:16;29:25;30:10,11,
12;42:7;45:10;56:13;
59:25;60:10,14;61:14;
66:13;71:8;73:23;
74:23;78:6;79:12;85:6;
87:1;88:24
**upgraded (1)**
74:12
**upon (1)**
56:5
**upped (1)**
46:18
**use (4)**
59:7,9;64:22;67:24
**used (4)**
26:10;29:23;59:12;
68:8
**using (3)**
63:1;64:24;71:7
**usually (2)**
16:22;42:7

**V**

**various (2)**
14:17;16:16
**vehicles (1)**
39:9
**version (2)**
50:15;62:21
**vested (1)**
46:14
**violations (2)**
57:25;58:17

**W**

**W-2 (5)**
37:14,17;43:10;44:5,
12
**wage (2)**
13:9,13;36:4
**wages (3)**

**33:14;37:18;43:14
waiting (1)**
65:3
**walk (5)**
62:8;71:20;78:10;
81:9;86:18
**walked (2)**
78:9;79:6
**Walker's (1)**
10:19
**walking (2)**
25:4;42:5
**walls (2)**
39:22;60:3
**Warehouse (1)**
27:25
**washer (1)**
73:9
**waste (1)**
59:10
**water (1)**
9:18
**way (5)**
6:17;16:19;37:20;
38:7;47:20;55:21;
56:23;81:25;82:24
**website (8)**
30:22;31:4,8,9;51:4,
18;52:21;54:9
**week (12)**
31:10,13,18;32:14,
15,17,19;43:17,23;
44:19;46:8;52:13
**weekend (1)**
68:18
**weekly (5)**
14:13;31:18;33:20;
34:5;38:1
**weeks (4)**
14:6;33:10,12;46:8
**weren't (6)**
15:14;21:4,17;29:19;
65:9;71:6
**what's (8)**
7:15;24:1,22;34:16;
38:20;62:16;63:22;
80:4
**WHEREUPON (17)**
5:1;15:24;16:1;
35:17;36:15,17,19;
42:24;43:2,4;48:13;
49:19;62:13;67:4;
75:14;80:1;87:16
**Whirlpool (5)**
72:5;73:3,4,6,8;
74:14
**white (1)**
41:25
**whole (3)**
5:25;8:21;54:5
**whomever (1)**
41:7
**who's (4)**

**7:21;14:25;69:25;
70:8
window (1)**
39:25
**windows (2)**
39:22;60:3
**withdrawn (1)**
46:16
**within (4)**
21:12;52:13,15;90:6
**without (4)**
79:8;82:3;88:10;
89:14
**witness (2)**
5:6;91:1
**women's (1)**
24:6
**word (1)**
71:7
**words (1)**
60:10
**work (49)**
9:13;10:7,9,10,18;
11:9;12:8,23;13:1;
15:10;21:16;29:14;
32:9;34:5,21,24;36:5;
37:24;38:5,10;39:1,18;
43:24;44:5,13,18,24;
45:5;53:20;56:7,15;
64:21;66:14;67:24;
68:1;69:13;70:3,3;
71:22;72:19,24;76:4;
77:5;78:11;79:19;
81:25;86:3;89:4;90:15
**worked (16)**
9:5;10:9;11:17,18;
24:19;30:17;33:11;
38:17;45:7;46:6;47:13,
14;61:8,8,9;68:2
**working (21)**
8:24;15:14;24:3;
29:3,19;32:1,8,9,19,23;
33:25;34:9;35:7,14;
38:22,24;42:20;43:18;
44:9;45:16;47:11
**works (2)**
54:25;56:6
**workstation (1)**
76:24
**worry (1)**
60:5
**worth (1)**
89:19
**write (2)**
71:4;82:19
**write-up (2)**
60:2,9
**written (8)**
14:3;33:23;59:25;
60:10,14;61:14;62:9;
84:12
**wrong (1)**
85:25

**wrote (4)**
  17:3,5;81:12;82:23

## Y

**year (8)**
  8:5;11:15;13:5,6;
  44:10,15;56:10,14
**years (10)**
  8:15,18;10:6,14;
  11:8;12:18;40:2,8;
  44:2;45:6
**yellow (1)**
  41:25
**Yep (1)**
  11:11
**York (1)**
  65:11

## Z

**zero (1)**
  40:22
**zeroed (1)**
  40:21

## 0

**006 (1)**
  22:14

## 1

**1 (4)**
  15:24;16:6,10,11
**10 (7)**
  48:13,17;50:5;63:10,
  12,25;79:10
**10/14/06 (1)**
  48:22
**10/4/15 (1)**
  35:24
**10:32 (1)**
  91:7
**1099 (1)**
  36:25
**10th (3)**
  75:20;80:24,24
**11 (14)**
  10:6,14;49:19,23;
  50:4,7;51:1,6,19;56:9;
  57:9,16,17;86:16
**12 (2)**
  62:13,17
**120 (1)**
  56:7
**122 (1)**
  88:20
**12th (1)**
  80:8
**13 (2)**
  67:4,8
**13th (1)**

85:23
**14 (4)**
  56:9;75:14,18;80:19
**14th (1)**
  86:1
**15 (5)**
  79:11;80:1,4;83:7;
  91:7
**1500 (1)**
  40:17
**16 (3)**
  87:16,20,21
**16th (4)**
  15:9;85:24;86:1,8
**1981 (1)**
  9:14
**1st (1)**
  68:23

## 2

**2 (6)**
  16:1,6,11;23:24;
  27:7;28:11
**20 (2)**
  8:15;32:20
**200 (1)**
  64:8
**2000 (1)**
  51:12
**2005 (1)**
  7:12
**2006 (2)**
  8:25;38:11
**2007 (1)**
  38:25
**2012 (2)**
  43:11,18
**2013 (3)**
  43:20;44:5;50:1
**2014 (9)**
  15:8;43:20;44:12;
  51:12,15;54:15;66:25;
  75:20;80:8
**2015 (8)**
  15:6;32:2,17;33:1,9;
  37:2,18;56:14
**2016 (1)**
  91:7
**25 (3)**
  32:15,16,21
**28 (1)**
  14:6
**29th (2)**
  66:25;68:17

## 3

**3 (4)**
  16:9;35:16,17,21
**300 (1)**
  40:17
**32 (2)**

58:22;59:5
**354 (1)**
  72:7
**364 (1)**
  72:7
**37 (3)**
  7:20,21;43:25
**38 (3)**
  7:20;43:19,25
**39 (2)**
  43:19,19

## 4

**4 (3)**
  36:15,23,24
**40 (3)**
  32:19;33:11;43:19
**401k (4)**
  46:4,22;54:1,4

## 5

**5 (3)**
  36:17,23;37:4
**50 (1)**
  9:24
**53 (1)**
  37:8
**55 (1)**
  38:8
**56 (1)**
  38:8

## 6

**6 (4)**
  36:19,23;37:14,17
**6th (4)**
  68:13;69:4,5,8

## 7

**7 (3)**
  42:24;43:8,10

## 8

**8 (3)**
  43:2,8;44:4
**8.05 (1)**
  37:11
**81 (1)**
  8:7
**82 (2)**
  8:7;9:14
**8th (1)**
  32:4

## 9

**9 (3)**
  43:4,8;44:12

**9.90 (1)**
  13:10
**9/21/15 (1)**
  35:23
**90 (2)**
  20:6;39:2
**90s (2)**
  10:15;11:16
**9th (1)**
  32:4